**Edmund J. HARM, Plaintiff-Appellant,**

v.

**BAY AREA PIPE TRADES PENSION PLAN TRUST FUND, Defendant-Appellee.**

No. 82–4369.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 13, 1983.

Decided March 22, 1983.

Richard A. Corsini, North Hollywood, Cal., for plaintiff-appellant.

Raphael Shannon, McCarthy, Johnson, & Miller, San Francisco, Cal., for defendant-appellee.

Before MERRILL, GOODWIN, and SNEED, Circuit Judges.

SNEED, Circuit Judge:

Appellant Edward Harm, a retired plumber, appeals from the district court's grant of summary judgment to the Bay Area Pipe Trades Pension Plan Trust Fund. He filed a timely appeal and invokes our authority pursuant to 28 U.S.C. § 1291. We affirm.

## I.

## FACTS

Harm, a member of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry, retired in March 1977. Although he had worked as a plumber for twenty-five years, he was only forty-five. He qualified for the Plan's service retirement benefit, which authorized employees who had not reached the normal retirement age of sixty-five to receive benefits if they had twenty-five years of credited service. He began receiving benefits of $605.82 per month.

In 1978 Harm moved from Northern California to Carson City, Nevada, where he became sole proprietor of a plumbing business. Harm performed a variety of managerial tasks in his business, but he did not perform any of the fifty-one tasks in the union's work classifications. The Plan, learning of his activity, suspended his benefits on October 1, 1979. It claimed that its rules required it to suspend the benefits of any service retiree working in the pipe trades industry until the retiree became eligible for normal retirement benefits.

## II.

## DISPOSITION BY TRIAL COURT AND ISSUES ON APPEAL

Harm filed for declaratory relief, alleging that the suspension was invalid because his activity was not "work" in the pipe trades industry and so did not fall within the suspension rule. He also argued that any rule

suspending benefits to service retirees working outside the Plan's geographic area violated section 404 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1104. Finally, he argued that were the suspension legal, it could last only as long as he remained in business.

Both parties moved for summary judgment. The district court held that the Plan could not continue to suspend Harm's benefits if he closed his business,[1] but it found that the suspension would remain legal until then. The Plan did not appeal the court's holding on the length of benefit suspension, so that issue is not before us. Only two issues are before us:

(1) Is the trustees' interpretation that Harm's business activities constituted "work" in the pipe trades industry arbitrary and capricious?

(2) Is a rule suspending the benefits of sole proprietors operating outside the Plan's geographic area in violation of section 404?

## III.

## STANDARD OF REVIEW

■ When reviewing the record in this case we engage in de novo review. For us to affirm the district court, we must be convinced that there is no genuine issue of material fact and that the Plan is entitled to summary judgment as a matter of law even when we review every conflict in the evidence most favorably to Harm. *See ILGW v. Sureck,* 681 F.2d 624, 628–29 (9th Cir.1982); *Heiniger v. City of Phoenix,* 625 F.2d 842, 843 (9th Cir.1980).

## IV.

## IS THE TRUSTEES' INTERPRETATION ARBITRARY?

In suspending Harm's benefits the trustees relied on article I, section 4 of the Plan,

---

1. When Harm retired in 1977, the Plan only suspended benefits during the period of employment. The trustees amended it, effective January 1, 1979, to require suspension from a retiree's return to employment until he reached normal retirement age. The district court found the trustees' attempt to apply this provision retroactively unlawful under *Brug v. Pension Plan,* 669 F.2d 570 (9th Cir.1982).

which prohibited service retirees from receiving benefits upon returning to "work" anywhere in the pipe trades industry.[2] Section 16 of article I defined "work" as including "all work, public or private, covered, or if not actually covered, of the type covered . . ., whether performed as an employee, supervisor, sole proprietor, member of an unincorporated firm, or officer of a corporation." Harm, while conceding that his employees performed work in covered employment, argues that he did not because he only hired and managed them. In his view section 16 should apply to sole proprietors only if they perform tasks in the union's work classifications.

█ He bolsters his position by arguing that we should weigh all doubts in interpretation against the Plan because it drafted the regulations. Standard rules of contract interpretation, however, do not apply in this case.[3] Instead, the Plan's interpretation must be sustained as long as it is reasonable. *See Smith v. CMTA–IAM Pension Trust,* 654 F.2d 650, 655 (9th Cir.1981); *Gordon v. ILWU–PMA Benefit Funds,* 616 F.2d 433, 439–40 (9th Cir.1980). To overturn the Plan's reading of its rule, Harm must demonstrate that it is arbitrary and capricious or erroneous with respect to a question of law. *Smith,* 654 F.2d at 654–55; *Gordon,* 616 F.2d at 439–40.

█ This Harm has not done. The Plan cut off benefits for "all work . . . performed as [a] sole proprietor." Work "performed as a sole proprietor" standing alone would certainly encompass Harm's manage-

rial activity. It is not limited to manual labor performed *by* a sole proprietor. The core of the functions that attach to a sole proprietor are managerial. When faced with the similar problem of describing an employer working on jobs traditionally handled by employees, the Plumbers employed a new classification, "working employer," in its collective bargaining agreement. The Plan's failure to use similar language weighs heavily against Harm's position.

Harm argues that "performed as a sole proprietor," as used in section 16, must be subordinated to the preceding clause defining penalized work as "covered [or] of the type covered." When so subordinated, it would follow that only a retiree who "performed as a sole proprietor" in employment "covered [or] of the type covered" would lose benefits. This reading of the rule is implausible. Suspension for work "covered . . . or of the type covered" already encompassed all union and nonunion jobs in the work classifications. This covers the field if Harm's interpretation were accepted. There would be no need to add a separate clause stating "whether performed as an employee, supervisor, sole proprietor, member of an unincorporated firm, or officer of a corporation." These clauses must embrace something else. It is unlikely that their reach extended only to supervisors, sole proprietors, or corporate members or officers who occasionally wielded a wrench or laid a pipe. The Plan's position that work "performed as a sole proprietor" was designed to cover Harm's everyday business activities is reasonable.

**2.** This provision provides in part:

Section 4. Disqualification Upon Return to Work

It is intended that Normal or Early Retirement Benefits, or the Service Retirement Benefit, will be payable only to those Employees who retire from work in the Pipe Trades Industry. Therefore, any retired Employee who returns to such work shall be disqualified from the receipt of any retirement benefits during any month in which he performs such work. Such benefits will be discontinued as of the first of the month following his return to active employment as stated above.

Payment of retirement benefits, at the monthly rate in effect prior to his re-employ-

ment, will be resumed following submission of evidence satisfactory to the Trustees that the Employee has ceased employment.

**3.** *See Rehmar v. Smith,* 555 F.2d 1362, 1368–69 (9th Cir.1976). Judicial scrutiny is limited to allow the trustees to play their role in pension fund administration. The need for federal law to override state law may not arise, however, when trustees interpret trust rules that govern their own position. *See Culinary & Serv. Employees Union v. Hawaii Employee Benefit Administration,* 688 F.2d 1228, 1230 (9th Cir.1982) (applying standard rules of contract interpretation to rule governing appointment and removal of trustees).

## V.

### DOES THE RULE VIOLATE SECTION 404 OF ERISA?

■ Under section 404, as under the similar provisions of section 302(c)(5) of the Labor Management Relations (Taft-Hartley) Act, 29 U.S.C. § 186(c)(5), trustees with the discretion to establish benefit provisions must act solely in the interests of "participants and beneficiaries." We have implemented this requirement with the "structural defect" test. Under it rules that exclude employees from receiving benefits for reasons which are arbitrary and capricious violate section 404.[4] *Miranda v. Audia,* 681 F.2d 1124, 1125 (9th Cir.1982); *Fentron Industries v. National Shopmen Pension Fund,* 674 F.2d 1300, 1307 (9th Cir. 1982); *Brug v. Pension Plan,* 669 F.2d 570, 573–79 (9th Cir.1982). Moreover, our decisions have erected certain presumptions that trustees must refute to avoid the "arbitrary and capricious" brand. If a rule, for example, excludes a disproportionate number of employees from receiving benefits, we hold that the burden shifts to the trustees to show a reasonable purpose for the exclusion. *Miranda,* 681 F.2d at 1125–27; *Ponce v. Construction Laborers Pension Trust,* 628 F.2d 537, 543–45 (9th Cir.1980). A rule that denies pensions to employees who have worked a substantially greater time than others who received benefits also shifts the burden to trustees to show a rational connection between the rule and the fund's purposes. *Elser v. I.A.M. National Pension Fund,* 684 F.2d 648, 655–56 (9th Cir.1982). So too the trustees cannot adopt a rule that retroactively deprives employees of benefits without giving them an opportunity to comply with the new rule, *Burroughs v. Board of Trustees,* 542 F.2d 1128, 1131 (9th Cir.1976), or deprives them of vested benefits because of an involuntary break in employment, *Lee v. Nesbitt,* 453 F.2d 1309, 1311–12 (9th Cir.1972).

■ Harm, however, does not persuade us that the Plan's suspension rule violated ERISA. It is true that the rule would allow unemployed service retirees with substantially less credited service than Harm to receive benefits, thus shifting the burden to the Plan to show a rational basis for the rule. The Plan, however, met this burden by showing a reasonable basis for suspending the benefits of *all* employed service retirees. As both its actuary and the co-chairman of the trustees stated, the Plan funded service retirement on the assumption that most retirees would continue working. The burden on the Plan for each retiree who did not was heavy. Harm and his spouse, under his interpretation, would be entitled to $141,557 in service retirement benefits without regard to the location of his employment. This was more than the $128,848 the Plan anticipated paying Harm in normal retirement benefits, and greatly in excess of the $19,703.02 that Harm's employers had paid into the Plan for him. These excess benefits would have to come largely from the stepped-up contributions of current participants. Thus the Plan's suspension of Harm's benefits was not arbitrary or capricious.

Harm alleges that his loss of benefits was illegal because "[t]he Plan has offered no grounds showing how HARM's employment in Nevada ... caused the PLAN, the Locals, or the contributing employer any prejudice or damage." This is not so. As already indicated, Harm's move to Nevada did not reduce the financial burden on the Plan; the relationship between prior payments into the Plan for Harm and his benefits remained the same. The Plan was therefore justified in treating him in the same manner as it did other working service retirees.[5] The Plan did not have to pay him when it did not pay all employed ser-

---

4. No claim is made that these rules were adopted in collective bargaining, so the standard of review in *United Mine Workers v. Robinson,* 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982), does not apply.

5. Harm did fare differently from service retirees who worked as employees; their normal retirement benefits, unlike his, increased as they continued to work. This is only an apparent inequality, however, because Harm was freed from having to pay the contributions that would fund his increased benefits.

vice retirees. The alleged differences in impact on the Plan's contribution base between Harm's employment without the Plan's geographic area and that of retirees within that area does not invalidate the rule.[6] *See Wilson v. Board of Trustees,* 564 F.2d 1299, 1302 (9th Cir.1977).

Nothing in *Elser* requires us to impose a heavier burden on the trustees. In *Elser* the trustees sought to defend their cancellation of the past service credits of employees whose employer had withdrawn from the fund. The trustees claimed that their action was needed to avoid excessive unfunded liability. Faced with this justification, the court required them to show "that the forfeiture provisions were *necessary* to protect the financial soundness of the Fund." 684 F.2d at 658 & n. 18 (emphasis added). The court found for the employees after it discovered that the trustees had never calculated their unfunded liability, and that there were other ways to meet their obligations. *Elser's* approach should be read in light of the standard of review set out in *Ponce,* which held that once a plaintiff establishes the existence of a structural defect, "the burden shifts to the trustees to show the reasonableness of the require-

ment." 628 F.2d at 543; *see, e.g., Miranda,* 681 F.2d at 1126–27. Although we described the burden that shifts as the burden of proof, 628 F.2d at 543–44, the trustees can meet this burden by showing "any reasonable basis" for their action, *see id.* at 542. This has been done in this case.[7]

Harm's other arguments can be disposed of quickly. Deference to the Department of Labor regulation in 29 C.F.R. § 2530–203–3(a) (1981) neither determines our decision nor did it that of the district court. Harm's view that he is entitled to benefits under ERISA because "the primary reason for ERISA [is guaranteeing] a retiree that he receive his pension benefits as promised after years of qualifying service" does not entitle him to benefits here. Congress has never envisioned, either in ERISA or the Taft-Hartley Act, a one-to-one correspondence between payments and benefits. *See Elser,* 684 F.2d at 655–56; *Ponce,* 628 F.2d at 542–43. ERISA's focus is on normal retirement. It would prevent a suspension were Harm of normal retirement age, *see* section 203(a), 29 U.S.C. § 1053(a), but it has left open such suspension for service or early retirees.[8] A graduated vesting of

---

6. The Plan offers two reasons to reject Harm's argument that his employment, unlike that of retirees in the Plan's geographic area, could not affect its contribution base. First, he might displace migrating employees whose employer sent contributions back to the Plan under its "home" policy. Second, its enforcement of its rule could encourage other plans to enforce similar rules, thus preventing an influx of employees into the Plan's area and increased competition for jobs with contributing employers. We do not address these arguments because we find the Plan's financial justification adequate to support its rule.

7. Only some decisions need be shown "necessary to protect the soundness of the Fund." If, as in *Elser,* the only explanation offered for a change in benefits is that it was compelled by financial necessity, there must be some evidence that such is the case. Other rules may represent a choice among competing policies or rely on behavioral predictions that are not susceptible to verification. In this latter group are the break-in-employment rules, which rest on the trustees' prediction that employees will be encouraged to seek continuing employment in the industry, rather than shift to other industries. *See Ponce,* 628 F.2d at 542; *Wilson,* 564

F.2d at 1302. Rules that require policy selection or matching of actuarial probabilities to the conditions of an industry fall more fully to the trustees' discretion. *See Souza v. Trustees of Western Conference,* 663 F.2d 942, 946–47 (9th Cir.1981); *Ponce,* 628 F.2d at 542; *Wilson,* 564 F.2d at 1302. The trustees can act in these areas without a showing of financial necessity.

The *Elser* court also cited *Central Tool Co. v. I.A.M. Nat'l Pension Fund,* 523 F.Supp. 812, 817 (D.D.C.1981), which held that a plan's trustees had to accomplish any reduction in benefits following employer termination by the least drastic means. 684 F.2d at 657. In *Central Tool,* however, the plan agreement itself required that benefits be reduced only "to the extent necessary." *See id.* at 657 n. 16. Neither *Elser* nor *Central Tool* should be read to interfere with the trustees' right to choose among reasonable alternatives in deciding the scope of a rule. *See Wilson,* 564 F.2d at 1302.

8. Harm does not raise this issue on appeal, although he contested it below. In any event, section 203(a) only governs normal retirement benefits, *see Hernandez v. Southern Nevada Culinary & Bartenders Pension Trust,* 662 F.2d 617, 619–20 (9th Cir.1981); *Hurn v. Retirement*

benefits that would achieve the result Harm desires may have advantages, *see* H.R.Rep. No. 533, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 4639, 4644, but Congress did not adopt such a scheme. The Plan has not deprived Harm of any *normal* retirement benefits. ERISA guarantees no more.

AFFIRMED.

*Fund Trust,* 648 F.2d 1252, 1253–54 (9th Cir. 1981); it does not affect the outcome of this case.