George CATOR, Plaintiff,

v.

HERRGOTT & WILSON, INC., Lawrence W. Jones and James P. Oliver, Defendants.

No. C–83–0149 WHO.

United States District Court, N.D. California.

June 12, 1984.

---

Michael J. Korda, Clark, Baron & Korda, San Jose, Cal., for plaintiff.

Kenneth J. Philpot, Jackson, Tufts, Cole & Black, San Francisco, Cal., for Hergott & Wilson.

Duane C. Musfelt, Jeffrey R. Kurtock, Lewis, D'Amato, Brisbois & Bisgaard, San Francisco, Cal., for Jones & Oliver.

## AMENDED OPINION [*]

ORRICK, District Judge.

The question presented by the cross-motions for summary judgment in this case is whether the Pension Committee of a plan subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, violated ERISA by changing only thirty days before his retirement the valuation date of benefits paid to plaintiff. Plaintiff, George Cator ("Cator"), the former president of defendant Herrgott & Wilson, Inc. ("H & W"), a commodities brokerage firm in San Francisco, California, seeks to recover $72,-000 that he alleges was withheld in bad faith from his pension account by H & W. H & W amended the company's pension and profit-sharing plans (the "Plan")[1] to provide for interim valuation dates of profits due under the Plan. The H & W Pension Administration Committee (the "Committee") asserts that it amended the Plan in accordance with its provisions and those of

ERISA and did not arbitrarily or capriciously affect Cator's vested benefits on his retirement in October 1981. Holding that the Committee, pursuant to the Plan's provisions empowering it to amend the Plan when advisable, reasonably exercised its authority so as to safeguard the interests of all thirteen H & W participants, the Court denies plaintiff's motion for summary judgment and grants defendants' motion for summary judgment.

I

From 1954 until his retirement on October 21, 1981, Cator was employed by H & W and together with twelve other H & W employees was a member of the Plan.

In October 1980, Cator informed H & W, including Committee members Lawrence Jones and James Oliver, defendants in this action, of his intention to retire a year later in October 1981. Cator and H & W executed a stock agreement whereby Cator sold his stock to the company and resigned as a director and officer of H & W. Pursuant to the agreement Cator remained employed by H & W for one year thereafter, and H & W continued to make contributions to the Plan on Cator's behalf.

At the time Cator announced his impending retirement the Plan provided that the trustee of the pension fund determine the fair market value of the trust fund on each May 31st (i.e., the "Anniversary Date"), and notify the Committee of such value. The Committee, in accordance with the Plan, then allocated to each participant's account its share of the net appreciation or depreciation.[2]

> *"Determination and Allocation of Income.* As of each Anniversary Date and prior to the allocations provided for in Section V-C the Trustee shall determine the fair market value of the Trust Fund and shall notify the Committee of its determination of the net appreciation (or depreciation) in the fair market value of the Trust Fund during such period, including the interest income of the savings accounts established pursuant to the provision of Section VIII-G. The Committee shall allocate to each account the net appreciation or depreciation and net income or loss (other

---

[*] A deletion and renumbering of the footnotes requires the issuance of the Amended Opinion.

1. The H & W pension and profit-sharing plans have identical provisions, save for those dealing with characteristics particular to each type of employee benefit. Because the provisions at issue are the same for both plans, judicial economy is best served by referring to the "Plan" rather than to each plan separately, and to cite from the pension plan only.

2. Section VD of the Plan provides:

As of May 31, 1981, some five months prior to Cator's retirement, total Plan assets were valued at almost one and a half million dollars, having appreciated an unusually high amount (23 percent) during the preceding year. Cator's portion of the benefits for that period amounted to slightly more than half a million dollars. Pursuant to the Plan's provisions an annual statement of benefits was delivered to Cator that reflected the amounts then existing in his account as of May 31, 1981.[3]

One month before Cator's October 1981 retirement date, on the advice of its actuarial and pension consultants, the Wyatt Company, and in accordance with the provisions of the Plan,[4] H & W amended the Plan to provide that in addition to the annual May 31st valuation there could be interim valuations, thus permitting the trustee to assess the Plan's value more frequently than on an annual basis.[5] The purpose of the interim valuation is to provide the Committee with the "necessary flexibility" to minimize the detrimental impact of fluctuating market conditions on the Plan's assets. Those fluctuations are best evidenced by the appreciation/depreciation figures for the five-month period between the May 31, 1981, annual valuation date and Cator's October 1981 retirement date: as of May 31, total Plan assets had appreciated 23 percent from the previous year, whereas by October the assets had dropped approximately 14 percent.

As a result of the new interim valuation scheme, Cator's account on his retirement in October 1981 was $72,000 less than had been reported on the preceding May 31st valuation date. Cator now asks for those $72,000 in damages, alleging the May 31st valuation date figure is a "vested" sum to which he was entitled on retirement, notwithstanding the Committee's revisions one month prior to his retirement.

At the hearing on the summary judgment motions, all facts presented in the moving papers, affidavits, and on oral argument were stipulated to by the parties. "When parties have entered into stipulations as to material facts, those facts will be deemed to have been conclusively established." *United States v. Houston,* 547 F.2d 104, 107 (9th Cir.1976); *Todd Shipyards Corp. v. Secretary of Labor,* 586 F.2d 683 (9th Cir.1978).

Insofar as material facts are not in dispute, the controversy at bar is ripe for summary judgment. The Court's function then is to grant summary judgment if either party is entitled thereto as a matter of law. *Federal Deposit Insurance Corp. v. First Finance Corp.,* 587 F.2d 1009 (9th Cir.1978); *Fruehauf Corp. v. Royal Exchange Assurance of America, Inc.,* 704 F.2d 1168 (9th Cir.1983).

than the interest income of such savings accounts) in proportion to the amount in such account prior to such allocation * * *."

**3.** Section II–C of the Plan provides:

"*Participant Communication.* The Committee shall keep on file a copy of this Agreement, and any amendments thereto, for examination by the Participants. The Committee shall furnish a Participant each year with a statement of his interest in the Trust Fund as determined by the Committee as of the last preceding Anniversary Date."

**4.** The parties concede that it was not until Cator's proposed retirement that the Committee addressed for the first time the issue of yearly versus interim valuations. Why the issue was not raised before Cator's proposed retirement is not known nor is it material or relevant to the resolution of these motions. What is dispositive is whether the Committee's conduct in amending the Plan to protect all thirteen H & W pension accounts was reasonable.

**5.** In the present case, the Plan authorizes H & W to amend the Plan in its discretion as follows:

"*Amendment.* The Employer expects to continue the Plan embodied herein indefinitely, but nevertheless reserves the right to amend this Agreement to any extent that it may deem advisable by delivery of a copy of said amendment executed by the authorized officers of the Employer and a certified copy of the resolution of its Board of Directors approving such amendment. Upon delivery of such copies to the Trustee, this Agreement shall be deemed to have been amended as set forth therein, and all Participants and all persons claiming any interest hereunder shall be bound thereby; provided, however, that no amendment: * * * (4) Shall adversely affect the then accrued benefits of any Participant."

## II

### A

At the outset, the Court must consider Cator's contention that the Committee acted "arbitrarily and capriciously" when it amended the Plan, to his detriment, one month prior to his retirement.

■ It is a well-settled rule that "those empowered with the administration of an employee pension trust shall be sustained unless arbitrary or capricious or contrary to law." *Smith v. CMTA–IAM Pension Trust*, 654 F.2d 650, 654 (9th Cir.1981); *Gordon v. ILWU–PMA Benefit Funds*, 616 F.2d 433 (9th Cir.1980); *Harm v. Bay Area Pipe Trades Pension Trust Fund*, 701 F.2d 1301 (9th Cir.1983). When exercising discretion in the administration of a pension trust fund, § 404 of ERISA imposes upon the fiduciaries the duty to act in the best interest of the participants and beneficiaries under the plan. 29 U.S.C. § 1104. Section 1104 provides in pertinent part as follows:

"(a)(1) * * * a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

＊　　＊　　＊　　＊　　＊　　＊

(D) in accordance with the documents and instruments governing the plan * *."

■ Thus, where a pension committee is empowered with discretion to amend a plan, as here, the committee's exercise of that discretion is subject to judicial review to determine whether the discretionary act is "arbitrary and capricious" and if the Committee's intention is to benefit the plan participants.

■ The 1981 Amendment to the Plan (the "Amendment"), which provides for an interim valuation date in addition to the already existing annual valuation date of May 31, reads as follows:

"1. 'Section I–V' is amended to be 'Section I–W' ", and a new Section I–V is added to read in full as follows:

"V. Valuation Date—The Anniversary Date and any other dates so designated by the Committee."

2. Section V–D is amended to read in full as follows:

"D. *Determination and Allocation of Income.* As of each Valuation Date (and on each Anniversary Date prior to the allocations provided for in Section V–C), the Trustee shall determine the fair market value of the Trust Fund and shall notify the Committee of its determination of the net appreciation (or depreciation) in the fair market value of the Trust Fund since the last preceding Valuation Date and the amount of the net income or loss of the Trust Fund during such period, including the interest income of the savings accounts established pursuant to the provision of Section VIII–G. The Committee shall allocate to each account the net appreciation or depreciation and net income or loss (other than the interest income of such savings accounts) in proportion to the amount in such account prior to such allocation."

Cator cannot sustain his burden of demonstrating that the Amendment is arbitrary and capricious. Although the parties concede that the action was taken in response to Cator's retirement, the purpose in enacting the Amendment was nevertheless reasonable; i.e., the Committee came to the realization that fluctuating market conditions, changing financial conditions, and economic circumstances could result in a "windfall" to Cator at the expense of the other twelve Plan participants if an interim valuation date was not enacted. *Cf. Palino v. Casey*, 664 F.2d 854, 858 (1st Cir. 1981). Indeed, the parties stipulated to the fact that absent the interim valuation, Cator's additional benefits would have deprived the other twelve participants of almost 8 percent of total fund assets.[6]

---

**6.** The difference in valuation of Cator's account between May 31 and October 31, 1981, was $72,390.14, a significant percentage of the total

fund assets. If the additional $72,390.14 had been paid to Cator, the other twelve Plan participants would have suffered a loss not only of

Moreover, the Committee amended the Plan on the advice of its actuarial and pension consultants; it did not undertake to amend the Plan unilaterally. In *Souza v. Trustees of Western Conference of Teamsters*, 663 F.2d 942, 947 (9th Cir.1981), the court held that such reliance on the advice of experts is evidence of the reasonableness of the amendment. Here, the Committee chose to accept the recommendation of its pension experts, that an interim valuation comports with the general practice of ERISA plans and would assure equitable treatment of the Plan participants. Given the reasonableness of the advice, there are no grounds for the Court to substitute its judgment for that of the trustees, nor to second-guess the technical provisions of a plan implemented on the advice of expert actuaries. *See Gordon, supra*, 616 F.2d at 439; *Souza, supra*, 663 F.2d at 947.

In *Tomlin v. Board of Trustees of the Construction Laborers Pension Trust for Southern California*, 586 F.2d 148, 151 (9th Cir.1978), the court likewise refused to substitute its judgment for that of the trustees where plaintiff, similar to Cator, argued for application of a different rule than that applied by the trustees:

"We must be ever mindful that it is for the Trustees, not the courts, to choose between two reasonable alternatives. As the court said in *Roark v. Lewis*, 130 U.S.App.D.C. 360, 364, 401 F.2d 425, 429 (1968):

'The court is fully cognizant of the internal pressures asserted on the trustees: the size of the pie is fixed and variations can be achieved only by changing the size of the number of the slices. There is no camouflaged design on the part of the Court to second-guess the discretionary judgments of the trustees.... It is for the trustees,

not judges, to choose between the various reasonable alternatives.' "

A further test for determining whether the Committee's action in amending the Plan was arbitrary or capricious was set out in *Harm, supra*, 701 F.2d at 1305. There, the court found that if an alteration, or amendment, to a pension plan had the effect of excluding a "disproportionate" number of employees from receiving benefits, the amendment constitutes a "structural defect." Certainly, no such defect exists here; the Amendment did not exclude even a single Plan participant.

Cator relies to a great extent on the holding in *Brugg v. Pension Plan of the Carpenter's Pension Trust Fund for Northern California*, 669 F.2d 570 (9th Cir.), *cert. denied*, 459 U.S. 861, 103 S.Ct. 135, 74 L.Ed.2d 116 (1982), as authority for his position that the Committee acted arbitrarily in denying him vested benefits. Yet, *Brugg* is factually distinguishable in a significant way. There, a clerical employee entitled to pension benefits pursuant to an amendment in her pension plan was denied benefits subsequent to the recision of the amendment after she had properly filed an application at retirement. In effect, the recision deprived the pensioner of *all* benefits.

Cator, in comparison, is not being denied pension benefits. Rather, the Committee, in reasonably exercising its discretion, sought to equitably distribute the existing pension fund assets to *all* Plan participants, whether it be to the account of those still employed or those choosing, as did Cator, to retire. And, the Amendment, unlike the *Brugg* scenario, took effect before Cator retired and, therefore, was not applied retroactively to divest him of eligibility for benefits.[7]

---

the 14 percent depreciation that might fairly be attributable to their accounts due to market fluctuations during that five month period, but would have also suffered a reduction by an additional 7.8 percent resulting from the payment to Cator. Declaration of Peter H. Zischke, page 4, lines 1–10.

7. The Amendment was unanimously approved by the Board of Directors of H & W on September 14, 1981, one month before Cator retired. He was notified promptly of the amendment before his retirement date. Declaration of Lawrence Jones, page 2, lines 17–21.

Finally, evidence that trust administrators have not acted arbitrarily is demonstrated if the administrators have consistently applied the amendment to all participants. *Gordon, supra.* In *Gordon,* the court stated that adherence to a consistent pattern of interpretation of pension plans is "significant evidence that the trustees have not acted arbitrarily," and thus the fact that the *Gordon* pensioner was compelled to file proper forms to qualify for pension benefits was not arbitrary because the same rule had been applied to past pension applicants. *Id.* at 440. Similarly, upon adoption of the Amendment, all Plan participants were revalued in accordance with its terms and the benefits distributed to terminating employees since the date of the Amendment were calculated pursuant thereto.

Altogether, the Amendment was enacted for justifiable reasons, and its net effect, of recalculating benefits, was equitably applied to all Plan participants. Accordingly, the Committee acted neither arbitrarily nor capriciously by revising the Plan, which thereby insured disbursement of pension funds would be undertaken in a fair manner for the benefit of all thirteen H & W pension plan participants.

**B**

█ Cator's secondary contention is that the Amendment was improper because it deprived him of an "accrued benefit" in violation of the Plan's provisions empowering the Committee to amend the Plan if such amendment does not "adversely affect the then accrued benefits of any Participant." That contention, based upon a misunderstanding of the Plan, is meritless.

First, the Plan provides that a participant is only entitled to receive benefits at his normal retirement age of sixty-five.[8] When a participant retires early, as did Cator who retired at age fifty-nine, his vested interest is retained in the Trust Fund until age sixty-five. However, the Committee, in its discretion, may authorize payment before that date:

> "*Former participants.* The distribution or the vested interest in the Trust Fund of a Participant whose employment terminates for reasons other than his retirement, death or Permanent Disability shall commence as of his Normal Retirement Date, and such vested interest shall be retained in the Trust Fund until that date; provided, however, that the balance of his interest in the Trust Fund may be paid to such former Participant prior to his Normal Retirement Date *at the discretion of the Committee.* The Committee may determine the method of such payment in accordance with the provisions of Section VIII–E."

Plan § VIII–C (emphasis added).

The Plan thus comports with ERISA's vesting provisions. ERISA gives an employee-participant no *vested* right to receive pension benefits until he reaches normal retirement age. 29 U.S.C. § 1053(a). Furthermore, "accrued benefit" is defined in § 1002(23) of ERISA to mean:

> "[I]n the case of a defined benefit plan, the individual's accrued benefit determined under the plan and * * * expressed in the form of an annual benefit *commencing* at normal retirement age * * *."

(Emphasis added.) Cator was not vested in any particular amount as of the May 31st valuation date. The annual summaries are merely an accounting tool that cannot be construed as "vested benefits." His benefits vest only at age sixty-five, or at the discretion of the Committee if he chooses to retire earlier.

That interpretation of the vesting provisions has been consistently upheld by the Ninth Circuit. For example, in *Hernandez*

---

8. Section VIII–B of the Plan provides:
   "*Normal Retirement Distribution.* The distribution of the interest of a Participant in the Trust Fund shall normally commence on such a Participant's Normal Retirement Date * *."

Section 10 of the Plan provides:
   "Normal Retirement Date—The Normal Date of a Participant shall be the first day of the month following the month in which such a Participant's 65th birthday occurs."

v. *Southern Nevada Culinary & Bartenders Pension Trust*, 662 F.2d 617 (9th Cir. 1981), the widow of a plan participant brought suit for benefits under a plan. At the time of his death the participant had a 100 percent vested interest in his accrued pension benefits. The claim was denied because he had not reached normal retirement age at the time of his death. The Ninth Circuit affirmed the district court's grant of summary judgment for the plan, rejecting the widow's claim that she was entitled to the "accrued benefits," stating that "she misconceives the nature of the right which becomes vested." *Id.* at 619. *Accord, Chambless v. Masters, Mates & Pilots Pension Plan*, 571 F.Supp. 1430, 1440 (S.D.N.Y.1983). In noting that ERISA requires no plan to "vest" benefits before normal retirement age, the *Hernandez* court pointed to the legislative history underpinning enactment of ERISA:

> "Moreover, other provisions of ERISA and its legislative history indicate that Congress never intended to impose upon a plan a requirement that any benefits be payable before age 65. *Riley v. MEBA Pension Trust*, 452 F.Supp. 117, 120 (S.D.N.Y.1978), *aff'd* 586 F.2d 968 (2d Cir.1978); *see* § 1056(a); H.R.Conf.Rep. No. 93–1280, 93d Cong., 2d Sess., *reprinted in* 3 [1974] U.S.Code Cong. & Ad.News 5038, 5062."

*Hernandez, supra,* 662 F.2d at 619–20.

In short, Cator's vested benefits would arise at the age of sixty-five, normal retirement age; otherwise, his vested benefits could be distributed at the Committee's discretion. But, to conclude, as does Cator, that on each May 31st, following the annual valuation date he was somehow "vested" in the sum reported thereto, is a mistaken understanding of the Plan's provisions. If it were otherwise, each participant could conceivably argue that on each May 31st his benefits vested, at which point no action by the Committee could have a bearing on that vested amount.

Furthermore, Cator seems to suggest that ERISA guarantees a particular amount of benefits to be paid to a partici-pant. However, in *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981), the Court, in rejecting plaintiff's claim that certain offset provisions with regard to state actions were invalid, held that ERISA does not require any particular level of benefits or method of calculation, but leaves this task to the parties creating the plan. *Accord, Employee Benefits Committee of the Retirement System of Hawaiian Telephone Co. v. Pascoe*, 679 F.2d 1319, 1321 (9th Cir.1982), *citing Alessi. Alessi, supra,* 451 U.S. at 511–12, 101 S.Ct. at 1900–01, states:

> "[W]hat defines the content of the benefit that, once vested, cannot be forfeited? ERISA leaves this question largely to the private parties creating the plan. That the private parties, not the Government, control the level of benefits is clear from the statutory language defining nonforfeitable rights as well as from other portions of ERISA. * * * Similarly, the statutory definition of 'nonforfeitable' assures that an employee's claim to the protected benefit is legally enforceable, but it does not guarantee a particular amount or a method for calculating the benefit."

In summation, the Court finds that the Committee properly interpreted the provisions of the Plan by denying Cator's claim that the May 31st valuation date figures reflected his "vested benefits," which were thereafter immune from the Committee's actions. The provisions as to vesting of benefits at age sixty-five, or at the Committee's discretion when an employee terminates earlier, are clear-cut and subject to particular interpretation, as discussed *supra*. Even if the provisions of the Plan are susceptible to more than one reasonable interpretation, the Court must give way to the trustee's interpretation. *See Gordon, supra,* 616 F.2d at 439. This is particularly true, where as here, the Court is being asked to second-guess the technical provisions of a plan amendment implemented on the advice of actuarial experts. *See, Souza, supra,* 663 F.2d at 945.

For the foregoing reasons, the Court grants defendants' motion for summary judgment, and denies plaintiff's motion for summary judgment.