Norman **BURDITT,** Matthew **Haworth, George Betancourt, Billy Joe Brannan, Jesse Brito, Dolphus Smith, Vernon Engel, Raymond Stewart, Linzie Hallum, and Paul Garibay, Plaintiffs,**

**v.**

**WESTERN GROWERS PENSION PLAN, and Western Growers Pension Trust Fund, Defendants.**

**No. 84–5544–AAH (KX).**

United States District Court,
C.D. California.

June 11, 1986.

**1492**

Georgiou & Tosdal, San Diego, Cal. by Thomas Tosdal, for plaintiffs.

Haight, Dickson, Brown & Bonesteel, Santa Monica, Cal. by Harold H. Brown, for defendants.

### MEMORANDUM OF DECISION AND ORDER OF JUDGMENT FOR PLAINTIFFS

HAUK, District Judge.

### I. PRELIMINARY STATEMENT

This matter is an action by former employees of Sun Harvest, Inc. (Sun Harvest), for recovery of pension benefits, and for declaratory judgment clarifying their rights to future pension benefits under the terms of the Western Growers Pension Plan. The action is brought pursuant to Section 502(a)(1)(B) of the Employee Retirement Income Security Act (E.R.I.S.A.), 29 U.S.C. Section 1132(a)(1)(B). Federal jurisdiction exists under 29 U.S.C. Section 1132(e)(1). Both parties have stipulated to the following facts.

Plaintiffs are former employees of Sun Harvest, a large lettuce grower, harvester, and producer which operated a vacuum cooler in Salinas, California, until the closure of its facilities on May 1, 1983. The vacuum cooler, known as Frigi-Vac, cooled lettuce grown by Sun Harvest and in the process removed excess moisture to prevent it from rotting during shipment to market.

The Western Growers Pension Plan (Pension Plan) is a multi-employer pension plan formed on July 15, 1967, pursuant to the Agreement and Declaration of Trust for the Western Growers Pension Plan (Pension Trust Instrument). The Pension Plan is administered by Trustees of the Western Growers Pension Trust Fund (Pension Trust Fund). The trustees are all employer representatives.

At all times material here, Sun Harvest was a "covered employer" within the meaning of Article I, Section 5 of the Pension Plan. Likewise, at all times material, Plaintiffs were "covered employees" within the meaning of Article I, Section 6 of the Pension Plan. Sun Harvest contributed to the Pension Plan on behalf of each Plaintiff for the purpose of providing future retirement credits and benefits.

In 1977, the Trustees amended the Pension Plan by adding Article IV, Section 3, to include a "Special Automation Adjustment" to the Normal Retirement Benefit. This amendment was adopted in response to earlier collective bargaining which had resulted in the "1978 Packing House Agreement" and the "1977–1980 Vacuum Cooler Agreement." The Special Automation Adjustment is a benefit applicable to qualified employees, by which they become eligible for reduced retirement benefits prior to their normal retirement age. It provides, in pertinent part, as follows:

If an Employee has maintained his seniority for at least three years with the Employer and the Employer certifies that such Employee's employment has been eliminated by reason of a change in operations, the Employee shall be entitled to an adjustment in the monthly Normal Retirement Benefit, as specified in Article IV, Section 2....

Sun Harvest made contributions to the Special Automation Adjustment benefit fund until the Frigi-Vac closure on May 1, 1983.

Frigi-Vac operated on a handloading basis until the end of the 1982 growing season.[1] In other words, crews of employees hand-loaded cartons of lettuce on conveyances for shipment to market. Late in the 1982 season, Sun Harvest management studied and considered converting Frigi-Vac from a handloading to a forklift loading system. Aside from the initial conversion expense, a forklift loading system takes substantially less time and is more cost efficient than handloading. The results of the study indicated that conversion would cost between one and two million dollars. Sun Harvest management determined that the conversion cost was too great; and chose, instead, to close Frigi-Vac and have lettuce cooled and shipped from Uni-Kool, a competing vacuum cooler plant with automated forklift loading capabilities also located in Salinas. Its employees are covered by the same collective bargaining agreement (the Vacuum Cooler Agreement) that governed Frigi-Vac employees. Sun Harvest thereupon purchased a 15% limited partnership interest in Uni-Kool.

On March 15, 1983, Sun Harvest representatives advised union representatives of their decision to close Frigi-Vac and offered to negotiate regarding the effect plant closure would have on the employees. During negotiation, union representatives proposed that automation certificates be issued to qualified employees, certifying that they had been displaced due to mechanization. Sun Harvest management determined that such issuance would comply with Article XX of the Vacuum Cooler Agreement[2] and agreed to issue automation certificates where appropriate.

Thirty-two Frigi-Vac employees were subsequently dismissed. Employer and union representatives determined that more than sixteen had lost their jobs "due to mechanization." Of those, only the ten Plaintiffs met all of Article XX's prerequisites to receiving automation certificates.[3]

During the 1983 growing season, Sun Harvest operated as a fifteen percent limited partner in Uni-Kool. At the end of the 1983 season, however, Sun Harvest ceased all operations as an entity, and transferred its assets to Sun World, Inc. Thereafter, the ten Plaintiffs, each of whom had received an automation certificate, applied for early retirement benefits from the Pension Trust Fund pursuant to Article IV, Section 3 of the Pension Plan. Each application was denied by the Pension Trust Fund trustees in July, 1983, on the basis that they interpreted the term "change in operations" to exclude a facility closure. Plaintiffs' appeal was heard by the Board of Trustees on August 10, 1983, and denied on August 26, 1983.

Now, after waiver of trial by the parties and submission of this matter on the Settled Statement of Facts, and the briefs filed herein; and after full consideration of the law, the evidence and the arguments presented by both parties, this Court hereby renders its Decision and Order of Judgment which shall constitute findings of fact and conclusions of law as required by Rule 52(a), Federal Rules of Civil Procedure.

## II. DISCUSSION

### A. *Burden of Proof*

■ Article IV, Section 4 of the Pension Trust Instrument expressly authorizes the

---

1. The typical growing season runs from April through October.

2. Article XX provides, in pertinent part:

    An employee who has maintained his seniority for at least three (3) years with the Company and the Company certifies that such employee's employment has been eliminated by reason of a change in operations due to mechanization shall be entitled to an adjustment in the normal age of retirement (65)....

3. Both parties agree that this action turns on whether Plaintiffs' employment was eliminated because of a "change in operations"—only one of the requirements for early retirement benefits. Therefore, the Court shall assume that Plaintiffs have met all the other requirements for Special Automation Adjustment benefits under Article IV, Section 3 of the Pension Plan, and Article XX of the Vacuum Cooler Agreement.

trustees to determine eligibility and benefit levels in their sole discretion, subject only to actuarial principles. This Circuit holds that federal courts do possess jurisdiction to review such exercises of trustee discretion. *Hurn v. Retirement Fund Trust, Etc. of So. Calif.*, 703 F.2d 386, 389 (9th Cir.1983); *Harm v. Bay Area Pipe Trades Pension Plan Trust Fund*, 701 F.2d 1301, 1304 (9th Cir.1983). Under Section 404 of E.R.I.S.A. (29 U.S.C. Section 1104), court review of discretionary pension plan eligibility requirements is guided by the strict fiduciary standards imposed on trustees to ensure that they establish and administer trust funds for the sole and exclusive benefit of the covered employees. *Hurn*, 703 F.2d at 389; *Harm*, 701 F.2d at 1305. In an attempt to balance the need for trustee discretion against the need to enforce the fiduciary duties imposed on trustees, this Circuit has traditionally reviewed trust rules to ensure that they are not arbitrary and capricious, unsupported by substantial evidence, instituted in bad faith, or erroneous on a question of law. *Hurn*, 703 F.2d at 389. *See Rehmar v. Smith*, 555 F.2d 1362, 1371 (9th Cir.1977).

If the Plaintiffs here can show violation of these standards, the burden then shifts to the trustees to show that their interpretation of Article IV, Section 3 is reasonable, based on the purpose of the Pension Trust Fund. *Music v. Western Conference of Teamsters Pension Trust Fund*, 712 F.2d 413, 419 (9th Cir.1983). The trustees can meet this burden by showing "any reasonable basis" for their interpretation. *Harm*, 701 F.2d at 1306. Consistent with this limited standard of review, this Court must give the trustees' interpretation wide latitude, and cannot substitute its personal judgment for that of the trustees. *Ponce v. Construction Laborers Pension Trust*, 628 F.2d 537, 542 (9th Cir. 1980); *Sailer v. Retirement Fund Trust, Etc.*, 599 F.2d 913, 914 (9th Cir.1979).

### B. *Application of Arbitrary and Capricious Standard*

The sole issue here for determination then, is whether the Pension Plan language contained in the Special Automation Adjustment clause ("change in operations") can support the interpretation given by the trustees ("exclusion of facility closure"). A review of Article IV, Section 3 shows the trustees' interpretation to be implausible, unduly harsh and contrary to the Pension Plan's explicit language. Therefore, fairness and common sense dictate that this Court find the denial of benefits to be arbitrary, capricious and unreasonable.

The trustees argue that they denied pension benefits because the Frigi-Vac closure was primarily a matter of economics rather than mechanization, and because a facility closure is insufficient reason to issue automation benefits. They offer several theories to support their conclusion—all unpersuasive.

The trustees first refer the Court to language contained in Article I, Section 2 of the Vacuum Cooler Agreement (the collective bargaining contract governing Frigi-Vac employees), arguing that it definitively controls the term "change in operations" as used in Article IV, Section 3 of the Pension Plan. The Vacuum Cooler Agreement at Article I, Section 2 provides, in pertinent part, as follows:

In the event any *new* or *experimental operation, container, or classification shall be installed* by the company *in any of said Plants*, or if there be any substantial change in packed weight of existing containers, or if any loading patterns are adopted which vary materially from existing patterns, the Company shall have the right to temporarily set the wage scale and working conditions, provided the scale be comparable to a similar classification as to rate, if feasible, *but shall notify the Union by notifying the shop steward within forty-eight (48) hours after the operation, container or classification is installed.* Within ten (10) days thereafter, or such extra time as agreed upon between the Company and the Union, the Company and the Union shall agree upon the wage scale and working conditions. If no agreement is reached within the time limitation set forth, the Parties agree to

go to arbitration within ten (10) days after written request by one Party to the other and the arbitrator shall make his determination within thirty (30) days after the submission of the matter to him in writing or such additional time as may be agreed upon by the Company and the Union .... (Emphasis added.)

The trustees argue that the above provision requires that the union be notified within forty-eight (48) hours after any new or experimental operation is installed by the employer. They contend that the union notification requirement operates as a "triggering provision," so that a "change in operations," as contemplated in Article IV, Section 3 of the Pension Plan and Article XX of the Vacuum Cooler Agreement, will not occur absent union notification of a "new or experimental operation." No evidence has been presented that the union received such notification. On this basis, the trustees simplisticly assume that no "change in operations" has occurred under Article IV, Section 3.

This argument is unsound. It is interesting that the trustees, who repeatedly emphasize that they were neither parties to nor governed by the Vacuum Cooler collective bargaining agreement insofar as issuance of automation certificates is concerned, now rely on that identical collective bargaining agreement to support their position. Nevertheless, a review of the language in Article I, Section 2 of the Vacuum Cooler Agreement clearly indicates that the trustees are reading the union notification provision out of context.

Article I, Section 2 has nothing to do with the definition of "mechanization," and there is no evidence indicating that the drafters of, or parties to the Vacuum Cooler Agreement intended such an interpretation. The trustees refer to the Packing House Agreement, a completely different collective bargaining agreement in their attempt to provide the missing link. Article XXIII, and Article I, Section 4 of the Packing House Agreement contain substantially equivalent, although not identical, language to Article XX and Article I, Section 2, respectively, of the Vacuum Cooler Agreement.

The Packing House Agreement at Article XXIII provides, in relevant part, as follows:

An employee who has maintained his seniority for at least three years with the Company and the Company certifies that such employee's employment has been eliminated by reason of a change in operations due to mechanization *as set forth in Article I, Section 4,* shall be entitled to an adjustment to the normal age of retirement (65) .... (Emphasis added)

Article I, Section 4 of the Packing House Agreement provides, in relevant part, as follows:

In the event any *new* or *experimental operation, container,* or *classification shall be installed* by the Company which is substantially and materially different, including rates of production and earnings, than the existing or previously existing operation, container, or classification for the members of this bargaining group and reflected in the wage addenda attached hereto and any supplements thereof in any of said plants, the Company shall have the right to temporarily set the wage scale and working conditions, providing the scale be comparable to a similar classification as to rate, if feasible, *but shall notify the Union by notifying the shop steward within 48 hours after the operation, container, or classification is installed.* Within twenty days thereafter, or such extra time as is agreed upon between the negotiating committee and the Union, the Negotiating Committee and the Union shall agree upon the wage scale and working conditions. If no agreement is reached within the time limitation set forth, the parties agree to go to arbitration within ten days after written request by one Party to the other and the arbitrator shall make. his determination within thirty days after the submission of the matter to him in writing or such additional time as may be agreed upon by the Negotiating Committee and the Union .... (Emphasis added)

The trustees correctly point out that Article XXIII of the Packing House Agreement specifically refers to Article I, Section 4 to define mechanization. This Court notes, however, the absence of any referral

in Article XX of the Vacuum Cooler Agreement to Article I, Section 2 of *that* agreement. The trustees argue that the absence is merely an oversight; evidenced by testimony of Don Dressler, primary drafter of both the Pension Plan and the Packing House Agreement, indicating the parties intended that the language and benefits of the automation clause in the Packing House Agreement be identical to that in the Vacuum Cooler Agreement. While the language of the automation clause was discussed by the collective bargaining parties in joint sessions during which the packing house and vacuum cooler principals participated, this fact is inconclusive and begs the question at issue. There is testimony by Andrew Church, the primary drafter of the Vacuum Cooler Agreement, directly contradicting Dressler and indicating that the wording of the automation clause for vacuum coolers was deliberately intended to be different than that for packing houses.

The Court chooses to embrace the credibility of Church, the author of the Vacuum Cooler Agreement and to reject the testimony of Dressler, the author of the Packing House Agreement. Absent any compelling evidence to support the trustees' theory, it would be improper to read any language gleaned from the Packing House Agreement into the Vacuum Cooler Agreement. These Plaintiffs are not subject to the Packing House Agreement, and it is obvious that the sole purpose for which Article I, Section 2 was drafted was to set wage scale and working conditions, of primary interest to the union in collective bargaining; *not* to signify the occurrence of mechanization, of primary interest to employees and their pensions. Moreover, it is especially significant to the Court that Sun Harvest and the union both agreed that issuance of automation certificates would be proper, pursuant to the same collective bargaining agreement relied upon by the trustees.

The trustees also contend that a significant factor in their denial of pension benefits was that Sun Harvest had been in the process of winding down its affairs in Sali-

nas for some period of time, leading to the assumption that the Frigi-Vac closure was purely for economic survival, and not for mechanization. The assumption that Sun Harvest was scaling down its operations is undisputed and clearly supported by the evidence. Another Sun Harvest vacuum cooler plant in Salinas had closed in 1981, and the volume of lettuce cooled by Sun Harvest in the Salinas area had declined each year between 1980 and 1983. Indeed, this gradual decline ultimately resulted in Sun Harvest's total cessation of operations as an entity when it transferred all assets to Sun World, Inc. in 1983. Even so, these facts have little relevance to whether there was a change in operations at Frigi-Vac due to mechanization.

The decision to mechanize is always based to a large extent on economic considerations. Clearly, after the initial conversion expense, an automated plant is substantially more cost efficient than an non-automated plant. Thus, even a floundering company might invest in an automation system with the hope that its long-term financial situation will improve. It is entirely reasonable that Sun Harvest management determined it would be more economical to become a limited partner in Uni-Kool and still reap the benefits of an automated system, than to invest independently in its own automation system. This Court will, therefore, not allow Plaintiffs to be penalized solely because their employer did not "mechanize" its own plant, and finds evidence relating to the economic status of Sun Harvest to be entirely irrelevant.

Additionally, this Court rejects the trustees' contention that Plaintiffs' proposed interpretation of the Special Automation Adjustment clause requires looking into Sun Harvest's subjective intent in closing Frigi-Vac. Such speculation is unnecessary. Sun Harvest has provided the Court with ample reason for its plant closure. Not only did the company stipulate in a settlement agreement with the union that its decision to close Frigi-Vac was in response to out-moded machinery.[4] It also issued

---

4. The Settlement Agreement, dated May 27, 1983, was entered into between Sun Harvest

automation certificates to that effect for each of the ten Plaintiffs.

The Trustees' final argument is that the actuary who performed a "costing" study of the Special Automation Adjustment had not considered the economic impact that plant closures would have on the Pension Trust Fund. During the formulation of the Special Automation Adjustment the actuary estimated the future costs of its implementation. In so doing, the following assumptions were made: *First,* that three to five employees at approximately fifty to sixty plants would be affected by mechanization. *Second,* that after discounting the estimated number of affected employees by the number who would not meet one or more of the other prerequisites to Article IV, Section 3 early retirement benefits, fifty to one hundred vacuum cooler employees would qualify for benefits; that is, one to two employees per plant. *Third,* that based on these figures, a five percent increase in each participating employer's regular retirement contribution would sufficiently fund the Special Automation Adjustment benefit.

As the facts reveal, thirty-two employees were displaced by the Frigi-Vac closure, ten of which were issued automation certificates. These figures are undeniably much greater than the actuarial assumptions and estimates relied on by the trustees.

Actuarial assumptions and estimates, however, cannot be the sole determining factors in the grant or denial or pension benefits. As previously indicated, there should be some rational nexus between the trustees' interpretation of the Pension Plan and the policy to be furthered thereby. *Rhoton v. Central States, Southeast and Southwest,* 717 F.2d 988, 991–92 (6th Cir. 1983); *Snyder v. Titus,* 513 F.Supp. 926,

933 (E.D.Va.1981). The sole policy justification offered by the trustees is their belief that a grant of benefits would threaten the Pension Trust Fund's financial stability. The trustees offer no proof of this. Short of their unsubstantiated claim that a grant of benefits here may deprive a future Pension Plan participant of Trust Fund benefits, they do not demonstrate that the actuarial soundness of the Fund will, in fact, be adversely affected in any way.

There is no doubt that any denial of benefits will help preserve a pension fund's financial resources for remaining and future participants. That, however, does not make denial of benefits appropriate in every case. Otherwise, trustee denials of benefits could never be deemed arbitrary and capricious. *Donovan v. Carlough,* 576 F.Supp. 245, 250–51 (D.C.D.C.1983); *Snyder,* 513 F.Supp. at 934. Actuarial principles may serve to defeat benefits only if the overall financial stability of the pension plan is endangered. *See Elser v. I.A.M. Nat'l Pension Fund,* 684 F.2d 648, 658 (9th Cir.1982), *cert. denied,* 464 U.S. 813, 104 S.Ct. 67, 78 L.Ed.2d 82 (1983); *Snyder,* 513 F.Supp. at 934. The trustees here have failed to make that showing.

Additionally, the Court concludes that the trustees have attempted to impose an ambiguity on the Pension Plan that is not apparent from its face, and for which no rational justification has been given. Article IV, Section 3 explicitly conditions the receipt of pension benefits upon the employer's issuance of an automation certificate. Automation certificates have, in fact, been issued. Thus, the Court will not permit the Plaintiffs to be deprived of their pension benefits; especially when they had no way of anticipating such a deprivation

---

management and the union at the conclusion of their negotiation over the effect of Frigi-Vac's closure. Its language futher supports this Court's holding:

### RECITALS

The Company made an economic decision not to invest in capital assets sufficient to allow the FRIGI–VAC COOLER to be converted to a forklift loading type operation. As a result of the Company's economic decision, the work formerly performed by workers at

the FRIGI–VAC COOLER is now performed by workers at UNI–KOOL COMPANY, a partnership of which SUN HARVEST, INC. is a partner.

\*　　\*　　\*　　\*　　\*　　\*

The Company acknowledges that one of the reasons for not reopening the FRIGI–VAC COOLER was the capital investment needed to convert the FRIGI–VAC COOLER from a handloading type operation to a mechanized (forklift loading) type of operation.

under the clear language of Article IV, Section 3. *See Snyder*, 513 F.Supp. at 935.

It is true that, generally, ambiguity in a pension plan should not be automatically interpreted against the trustees. *Jung v. FMC Corp.*, 755 F.2d 708, 713 (9th Cir. 1985); *Rehmar*, 555 F.2d at 1369. However, where as here the trustees' interpretation is neither one of at least two reasonable alternatives, that general principle is no defense. *See Jung*, 755 F.2d at 713; *Smith v. CMTA–IAM Pension Trust*, 654 F.2d 650, 655 (9th Cir.1981). Moreover, even if the trustees' allegation of adverse economic effect on the Pension Plan were true, it would still be no defense, since their interpretation of Article IV, Section 3 lacks any rational nexus to the primary purpose of the Pension Plan, which is opening the window of early employee retirements in the event of a change in operations caused by mechanization. *See Rhoton*, 717 F.2d at 991–92.

## III. CONCLUSION

The trustees have given a completely implausible interpretation of the Pension Plan's terms. They have unreasonably relied on additional requirements which are not set forth in the terms of the Plan, and which cannot readily be inferred from its clear language. The Court recognizes its limited standard of review; but simply cannot sanction the trustees' unbridled abuse of discretion in the instant case. Accordingly, this Court finds and concludes that the trustees' denial of Pension Benefits under the Special Automation Adjustment articulated in Article IV, Section 3, is arbitrary, capricious, and unreasonable.

### ORDER OF JUDGMENT

Upon the stipulated evidence produced in this matter and the law applicable thereto, this Court finds and concludes that the Pension Fund is liable to the Plaintiffs for early retirement benefits under the terms of the Pension Plan, including retroactive payments to May 1, 1983, the date of closure and mechanization, together with pre-judgment interest thereon at the legal rate of 7 percent; and post-judgment interest at the rate of 7.03 percent, pursuant to 28 U.S.C. Section 1961.

Additionally, Plaintiffs shall recover reasonable attorney's fees and costs, pursuant to 29 U.S.C. Section 1132(g), which shall be determined at a future hearing to be set upon plaintiffs' motion and accompanying affidavits, and appropriate opposition by Defendants.

Let judgment be entered in accordance with the findings of fact and conclusions of law set forth in the foregoing Decision, and in this Order of Judgment.