William KAY, on behalf of himself
and all others similarly
situated, Plaintiff,

v.

THRIFT AND PROFIT SHARING PLAN
FOR EMPLOYEES OF BOYERTOWN
CASKET COMPANY, et al., Defendants
and Third–Party Plaintiffs,

v.

David P. ANDERSON, et al.,
Third–Party Defendants.

Civ. A. No. 89–4427.

United States District Court,
E.D. Pennsylvania.

Dec. 31, 1991.

Gordon W. Gerber, Arthur S. Gabinet, Dechert, Price & Rhoads, Philadelphia, Pa., for plaintiff.

Ira B. Silverstein, Fox Rothschild O'Brien & Frankel, Philadelphia, Pa., for defendants and third-party plaintiffs.

Kevin T. Fogerty, Traub Butz & Fogerty, P.C., Allentown, Pa., for third-party defendants.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

This case arises as a result of the precipitous drop in the stock market on October 19, 1987, which has come to be known as "Black Monday." Plaintiff class, comprised of employees fired during the quarter that ended September 30, 1987, alleges that the defendants improperly amended the Thrift and Profit Sharing Plan for Employees of Boyertown Casket Company ("the Plan") to reduce their benefits.

As of the dates the employees were fired, the written terms of the Plan required that payment of benefits to the employees be based on a valuation on September 30, 1987. After Black Monday, however, the defendants amended the terms of the Plan to use a valuation date of October 30, 1987. As a result of this amendment, defendants reduced the benefits payable to members of the plaintiff class. Plaintiffs submit that, as a matter of law, defendants could not retroactively change the Plan to force a post-crash valuation of benefits on employees who had been fired before the crash and were awaiting payment based upon the September 30, 1987 valuation date. Plaintiffs claim that the amendment violated the rights under the Plan and under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.*, and that defendants must pay plaintiffs the value of their benefits as of September 30, 1987. In addition, plaintiffs claim that, by adopting the amendment and applying it to reduce their benefits, the non-plan defendants violated their fiduciary duties and, thus, are personally liable to plaintiffs.

## I.

### A. *The Parties*

Plaintiff William Kay was formerly the Chief Executive Officer of Boyertown Casket Company ("Boyertown"). The defendants in this case include the Plan; Boyertown, which created the Plan for the benefit of its employees; Amedco Funeral Supply, Inc. ("AFS"), which acquired Boyertown in May of 1987 and succeeded to Boyertown's liabilities under the Plan; and Service Corporation International ("SCI"), AFS' parent company. Sometime on or before April 1, 1988, AFS changed its name to Boyertown Casket Company.

The defendants also include the following individuals who were allegedly fiduciaries of the Plan:

Barry Doney—former Plan administrator, formerly controller of Boyertown;

Sharon Lacey—Manager, SCI Pension department;

Joseph Turner—Vice President, administration of SCI, member of the Board of AFS;

David Beck—Trustee of the Plan and Member of SCI, Thrift Committee;

Donald Gould—Trustee of the Plan and Member of SCI, Thrift Committee;

Keith Plowman—Trustee of the Plan and Member of SCI, Thrift Committee;

E. Keith Payne—Member of the Board of AFS;

Ben Dees—Member of the Board of AFS.

### B. *The Relevant Plan Provisions*

Boyertown created the Thrift and Profit Sharing Plan for Employees of Boyertown Casket Company ("the Plan") in 1982 as a benefits plan for Boyertown employees. By operation of law and pursuant to the document creating and governing the Plan ("the Plan Document"), the Plan was subject to ERISA.

Participating employees had the option of investing their benefits in either a "Fixed Income Investment Fund," or in the "Diversified Investment Fund" or both ("the Plan Funds"). The Diversified Investment Fund ("the Diversified Fund") was to invest benefits in stocks and securi-

ties. The Diversified Fund invested in two stocks, the "Mutual Qualified Funds" and the "Clipper Fund." All of the members of the plaintiff class elected to invest all or part of their benefits in the Diversified Fund.

While plaintiffs were employed, the Plan provided that, upon termination, employees were to receive their benefits based upon the value of their benefits as of the last day of the calendar quarter in which the employee was terminated. Section 9.01(b) of the Plan Document provided:

Upon the termination of employment of a Member before reaching his 65th birthday for reasons other than Disability or death, the value of his vested portion shall be determined as of the Valuation Date on or immediately after the date of his termination and shall be distributed as provided in Section 9.02.

Exhibit B to Plaintiffs' Motion for Summary Judgment, Plan Document at § 9.01. "Valuation Date" was defined as "the last business day of each calendar quarter." *See* Exhibit B to Plaintiffs' Motion for Summary Judgment, Plan Document § 1.31. Under section 9.02 of the Plan Document in effect at the time, distributions were to be made "in one lump sum as soon as practicable after the Valuation Date on or immediately after the date of termination of employment, and in any event, not later than the 60th day after the close of the Plan Year in which the Member's termination of employment occurs." *See* Exhibit B to Plaintiffs' Motion for Summary Judgment, Plan Document at § 9.02.

Valuation of each employee's benefits was done by taking the balance of each employee's account as of the preceding Valuation Date, adding the employee and employer contributions during the quarter to each employee's prior balance, and allocating a ratable portion of the earnings of the entire fund for the quarter to each employee's account. *See* Exhibit B to Plaintiffs' Motion for Summary Judgment,

Plan Document at §§ 6.01, 6.02, and 6.03. The Plan Document required benefits to be paid "as soon as practicable," but historically it took time to make the calculations, and payments were not actually made to terminated employees until thirty to forty-five days after the Valuation Date. *See* Exhibit C to Plaintiffs' Motion for Summary Judgment, Gravitz Deposition at pp. 14–17. No part of the gains or losses in the Diversified Fund's investments that occurred between the Valuation Date and the date of actual payment of benefits was allocated to terminated employees. *See* Exhibit C to Plaintiffs' Motion for Summary Judgment, Doney Deposition at pp. 17–20. Indeed, the Trust Agreement relating to the investment of the Plan's assets states that "all charges and credits (between Valuation Dates) shall be considered as being made immediately after the next ensuing valuation." *See* Exhibit D to Plaintiffs' Motion for Summary Judgment, Trust Agreement at p. 4.

### C. *William Kay's Termination and the Valuation of Benefits*

On May 14, 1987, AFS (a subsidiary of defendant SCI) acquired substantially all of the assets of Boyertown and succeeded to Boyertown's liabilities under the Plan. Following the acquisition, numerous Boyertown employees, including William Kay and other members of the plaintiff class, were terminated. By September 30, 1987, nearly 100 employees had been fired.[1] This was many more employees than had ever been terminated in a single quarter since the inception of the Plan.

Kay was relieved of all responsibilities at Boyertown shortly after the acquisition. On June 23, 1987, defendant Donald Gould, an SCI executive, wrote to Kay formally terminating Kay's employment as of June 30, 1987. Kay's last day at work at Boyertown was June 30, 1987. Accordingly, under the terms of the Plan as described above, Kay's benefits were to be valued as

---

**1.** Of the nearly 100 employees terminated by the end of September 1987, at least 48 were members of the Plan who had all or part of their benefits invested in the Diversified Investment

Fund. Like Kay, these individuals were entitled to receive their benefits based upon the valuation date of September 30, 1987. *See* Exhibit F to Plaintiffs' Motion for Summary Judgment.

of the last day of the calendar quarter on or immediately following his termination. As of June 30, 1987, the value of Kay's account was $191,755.21.

In July 1987, Kay asked Barry Doney, the Plan's administrator, when he would receive payment of his benefits. Doney replied that because Kay would receive his final paycheck in July, he was deemed terminated in the third quarter, as opposed to the second quarter. Therefore, Kay would receive his benefits based on a Valuation Date at the end of the third quarter— September 30, 1987. Kay inquired about transferring his benefits to the Fixed Income Fund in the interim. Doney replied that it was too late to transfer the funds for the third quarter, and that a transfer for the last quarter would be fruitless because Kay would be cashed out of the Plan as of September 30, 1987. *See* Declaration of William Kay, sworn to April 11, 1990, at ¶ 3. Other employees were told the same thing. *See* Declaration of Eugene H. Sargent, sworn to January 16, 1990, at ¶ 3.

In early October 1987, in accordance with routine practice, Mr. Doney sent the relevant information to Buck Consultants, Inc. ("Buck"), the actuarial consultants for the Plan, so that Buck could begin the September 30, 1987 valuation. Before the end of September 1987, SCI had decided to give 100% vesting to all Plan participants, entitling them to 100% of the contributions Boyertown had made to their accounts, regardless of the number of years that they had worked.[2] Accordingly, Mr. Doney instructed Buck to perform the valuation with 100% vesting. *See* Exhibit G to Plaintiffs' Motion for Summary Judgment.

Ordinarily the valuation process took six to eight weeks, but this valuation was not ordinary because of the unprecedented number of plan participants who were being cashed out. Despite this extraordinary situation, defendants did nothing to protect the Plan or the benefits of the former employees from possible fluctuations in the stock market between the September 30, 1987 Valuation Date and the time that the calculations were completed and the employees were paid. *See* Exhibit C to Plaintiffs' Motion for Summary Judgment, Doney Deposition at pp. 25–27.

Throughout October, Buck worked on the valuation. During the early part of October, as the stock market began to decline, the value of the Plan's funds also declined. By October 16, 1987, the Plan's funds had lost 4–5 percent of its value. Fred Ihrig, Vice–President of Human Resources of Boyertown (who had not yet been fired by the new owners of Boyertown) became concerned about the impact of the declining stock market on the Plan's ability to pay benefits to terminated employees based on the September 30, 1987 Valuation Date. In a memorandum summarizing a conversation with Mr. Ihrig on October 16, 1987, David Gravitz of Buck referred to this problem as the "leveraging effect." *See* Exhibit H of Plaintiffs' Motion for Summary Judgment. The "leveraging effect" referred to the fact that because so many employees were entitled to their benefits based on the value of the Plan's funds as of September 30, 1987, if the Plan's investments lost value between that date and the actual payout date, the remaining participants would suffer a disproportionate decline in their benefits.[3]

---

**2.** This decision was consistent with SCI's regular policy in all of its acquisitions. *See* Exhibit C to Plaintiffs' Motion for Summary Judgment, Lacy Deposition at pp. 49–50.

**3.** A simple example illustrates "the leveraging effect." Two employees, "B" and "C", are equal participants in a pension plan ("the Plan"). As of September 30, the total assets of the Plan are $200.00. B withdraws from the plan on September 30 and, pursuant to the Plan, is to be paid the September 30th value of his benefits. If the value of the assets is unchanged on the day that the Plan finally issues a check to B (i.e. the payout date), B gets his $100, and C still has

$100 in his account. However, if the value of the Plan's assets increases to $250.00 before B is paid, B would still receive only $100 based on the September 30th valuation, and C would have $150 in his account—rather than B and C each receiving $125. B's withdrawal of his benefits at their September 30th value magnifies the effect of fluctuations in the Plan's assets, both positive and negative, between the valuation date and the payment date. For example, if the value of the Plan's assets was $200 as of the valuation date (i.e. September 30th) but decreased to $150 as of the payment date, B would still receive $100 and C would have only $50 in

Mr. Ihrig thought that these issues implicated fiduciary responsibilities of Mr. Doney as the Plan administrator because Mr. Doney had authority to move the Plan assets out of the Diversified Fund. Despite Mr. Ihrig's concerns and his discussion of those concerns with Mr. Doney and Mr. Gravitz, no action was taken to prevent further "leveraging."

### D. *Black Monday and the Revaluation of Benefits*

Mr. Ihrig's fears became defendants' reality with the stock market's steep decline on October 19, 1987. The stock market dropped almost 500 points, and the value of the assets in the diversified fund dropped nearly 17 percent.

Black Monday occurred before calculation of the September 30, 1987 values was completed. Despite the losses, the Plan had sufficient funds to pay plaintiff-class members their benefits based on the September 30, 1987 Valuation Date and still have enough left over to provide benefits to the remaining participants of the Plan. Nonetheless, defendants recognized that, because of the leveraging effect, paying the plaintiffs the full amount of their benefits would exaggerate the impact of Black Monday on the remaining Plan participants.[4]

The failure to prevent or minimize leveraging exposed the Plan fiduciaries to claims by plan participants for breach of fiduciary duty. Thus, SCI felt compelled to deflect some of the effect of Black Monday from participants who were still employed. Otherwise, the Plan would be forced to

"rob Peter [the remaining employees] to pay Paul [terminated employees]." *See* Exhibit C of Plaintiffs' Motion for Summary Judgment, Lacy's Deposition at pp. 71–72. Defendant Joseph Turner advised Mr. Doney that SCI's pension department would assume responsibility for deciding what to do in his response to Black Monday.

As manager of SCI's pension department, defendant Sharon Lacy prepared a list of options. She suggested, among other possibilities, (1) suspending all benefits payments, (2) having Boyertown make supplemental contributions to the Plan, and (3) amending the Plan to permit a post-crash "Interim" Valuation Date for all benefits, including those benefits payable to the terminated employees awaiting payment based on the September 30, 1987 Valuation Date. *See* Exhibit C of Plaintiffs' Motion for Summary Judgment, Lacey Deposition at pp. 95–96.

Ultimately, the defendants elected the interim valuation approach. By paying the terminated employees a lesser amount of benefits based upon a Valuation Date after Black Monday, defendants could "rob Paul [terminated employees] to pay Peter [remaining employees]," thus avoiding the leveraging effect. Before deciding, Ms. Lacy solicited advice for Boyertown's actuaries at Buck and from SCI's actuaries, William M. Mercer–Meidinger Associates. Mercer–Meidinger sent a brochure, but provided no specific guidance. However, Buck, Boyertown's primary consultants, specifically advised against using an inter-

his account—instead of the $75 (i.e. half of the value of the assets as of the payout date) that C would have had in his account if B had been paid his benefits based upon their value on the payment date rather than their value on September 30. This is the same effect that was at work in the present case with the Boyertown Plan—but with almost fifty employees, not just one, entitled to benefit payments from the Diversified Investment Fund valued as of September 30, 1987.

4. The leveraging effect, however, was not caused by Black Monday. Black Monday magnified the leveraging effect, but any drop in the stock market that occurred after the Valuation Date, but before payment, would have resulted

in a leveraging effect. Ordinarily, with only one or two employees cashing out of the Plan, the effect was minimal. In October of 1987, however because so many former employees were awaiting payment, the impact of the leveraging effect was much greater. The magnitude of the drop in the stock market that occurred on Black Monday was unpredictable. Nonetheless, it was possible to predict—indeed it was obvious—that with so many former employees awaiting payment, any disturbance in the stock market would result in severe leveraging, either to the benefit or detriment of the remaining participants in the Diversified Investment Fund (i.e. the third-party defendants).

im valuation. David Gravitz of Buck advised Boyertown, as early as October 26, 1987, that

> it would be a large business risk to try and amend the plan now to change the valuation date retroactively, and I did not think we would recommend this approach.

See Exhibit C to Plaintiffs' Motion for Summary Judgment, Gravitz Deposition at p. 37. Gravitz' concern was that "the plan provided [that] the employees were entitled to their balances as of September 30th," and he "did not think the plan could be amended retroactively to change that." See Id. See also Exhibit L to Plaintiffs' Motion for Summary Judgment. Mr. Gravitz suggested that the best solution was for the company to make additional contributions to the Plan to compensate for the added loss inflicted by the leveraging effect. See Id.

Buck's in-house counsel, Henry Von Wodtke concurred with David Gravitz's assessment. Mr. Von Wodtke advised defendant Joseph Turner, Vice–President of Administration of SCI, that "our concern is that the proposed course of action does not conform with the Plan language." See Exhibit M to Plaintiffs' Motion for Summary Judgment.

Ms. Lacy rejected the advise from Buck and recommended the use of the Interim Valuation Date. See Exhibit C to Plaintiffs' Motion for Summary Judgment, Lacey Deposition at pp. 101–02. On December 17, 1987, Mr. Doney instructed Buck to perform a valuation based upon the Valuation Date of October 30, 1987. Buck insisted upon having these instructions in writing. See Exhibit N to Plaintiffs' Motion for Summary Judgment.

On December 22, 1987, the Board of Directors of AFS—defendants Joseph Turner, Keith Payne, and Bee Dees—adopted a retroactive amendment to the Plan Document to permit an Interim Valuation Date of October 30, 1987 ("the Amendment"). See Exhibit C, Lacey Deposition at p. 146, Exhibit O, and Exhibit A to Plaintiffs' Motion

for Summary Judgment. The Amendment provided in part:

> Effective as of the date of the execution hereof, Section 1.31 of the Plan shall be deleted and the following shall be substituted therefor:
>
> 1.31 "Valuation Date" means the last business day of each calendar quarter, October 30, 1987 and any other date established by the Committee as a special Valuation Date for purposes of equitable administration of the Plan.

See Exhibit O to Plaintiffs' Motion for Summary Judgment.

SCI circulated an announcement advising Plan participants of the decision to declare an Interim Valuation Date. Buck valued participants' benefits as of October 30, 1987, and payments to the class began in January of 1988. On January 15, 1988, defendants paid Kay $168,117.67—the value of his benefits as of October 30, 1987. This represents a loss of $33,993.85 from the value of Mr. Kay's benefit as of September 30, 1987. The losses of the other participants ranged from as little as $6.00 to as much as $13,000.00.[5] See Exhibit F to Plaintiffs' Motion for Summary Judgment.

### E. *Kay's Request for His Benefits*

Believing that defendants' amendment of the Plan and retroactive imposition of the Interim Valuation Date was unlawful as it applied to William Kay, Kay's counsel wrote defendants on February 2, 1988, requesting payment of Kay's benefits valued as of September 30, 1987. Writing on behalf of the Thrift Committee Members (i.e. Gould, Beck, and Plowman), Sharon Lacy replied to Kay's request on May 2, 1988, stating that the Thrift Committee "has determined that Mr. Kay is not entitled to any additional benefits from the Plan, and, as such, Mr. Kay's claim is denied." See Exhibit R to Plaintiffs' Motion for Summary Judgment.

As required by the Plan, counsel for Kay wrote defendants on May 13, 1988 to appeal the Thrift Committee's decision. See

---

**5.** The total loss to the plaintiff-class of Plan participants is $128,820.30. See Exhibit F to

Plaintiffs' Motion for Summary Judgment at p. 1 (Total Difference for Group I).

Exhibit S to Plaintiffs' Motion for Summary Judgment. On July 11, 1988, defendants replied and once again denied Kay's claim. *See* Exhibit T to Plaintiffs' Motion for Summary Judgment.

Having exhausted all internal avenues, Kay filed this suit on behalf of himself and all other Plan participants fired in the second and third quarters of 1987 whose benefits were paid on the basis of the Interim Valuation Date of October 30, 1987.

## II.

In Count I of the Amended Complaint, plaintiffs claim that defendants' adoption and implementation of the October 30, 1987 Interim Valuation Date and refusal to pay plaintiffs their benefits based upon the September 30, 1987 Valuation Date was in direct violation of the Plan, as well as ERISA. In Count II, plaintiffs claim that, in retroactively applying the Interim Valuation Date of October 30, 1987, the non-Plan defendants acted arbitrarily and capriciously and violated their fiduciary obligations.

### A. *Breach of the Plan Document*

■ The Supreme Court has held that, in an ERISA breach of contract action, "a denial of benefits ... is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). Under the *de novo* standard, the question is whether the fiduciaries' interpretation of the contract was correct. Under the more deferential standard, the question is whether the fiduciaries' interpretation of the contract was arbitrary and capricious.

In the present case, Section 10.01 of the Plan provides that the general administration of the Plan and the responsibility for carrying out the provisions of the Plan shall be placed in the Thrift Committee. The Plan further provides:

> Subject to the limitations of the Plan, the [Thrift] committee from time to time shall establish rules for the administra-

tion of the Plan and the transaction of its business. *The determination of the Committee as to any disputed questions shall be conclusive.*

*See* Exhibit B to Plaintiffs' Motion for Summary Judgment, Plan Document at § 10.07 (emphasis added). I conclude that this language in the Plan vests the Thrift Committee with sufficient authority and discretion to trigger the abuse of discretion standard of review under *Bruch. See De-Nobel v. Vitro Corp.*, 885 F.2d 1180, 1187 n. 4 (4th Cir.1989) (applying *Bruch* and holding that a plan document need not contain the word "discretion" or any particular "magic words" but must convey that the fiduciaries have power to make determinations and rules governing plan administration); *see also Ferrara v. Allentown Physician Anesthesia Associates, Inc.*, 711 F.Supp. 206, 209 (E.D.Pa.1989).

■ Therefore, this court must determine whether defendants' interpretation of the documents governing the Plan (i.e.—the Plan Document and the Trust Agreement) in a manner permitting them to retroactively adopt and implement the October 30, 1987 Interim Valuation date was arbitrary and capricious. As the Supreme Court in *Bruch* made clear, what follows from the applicability of the abuse of discretion standard is that the fiduciary's interpretation of relevant provisions of the plan documents—hence the challenged denial of benefits—"will not be disturbed if *reasonable." Bruch*, 489 U.S. at 111, 109 S.Ct. at 954 (emphasis added). *See also Dennard v. Richards Group, Inc.*, 681 F.2d 306, 314 (5th Cir.1982) ("factors to be considered in applying the arbitrary and capricious standard" include analysis of "reasonableness" of interpretation offered by plan administrators); *Morgan v. Mullins*, 643 F.2d 1320, 1323 (8th Cir.1981) (application of arbitrary and capricious standard requires examination of the reasonableness of the Trustee's interpretation of disputed language).

Section 9.01(b) of the Plan specifically provides:

> Upon termination of employment of a Member before reaching his 65th birth-

day for reasons other than Disability or death, the value of his Vested Portion shall be determined as of the Valuation Date on or immediately after the date of his termination of employment and shall be distributed as provided in Section 9.02.

*See* Exhibit B to Plaintiffs' Motion for Summary Judgment, Plan Document at § 9.01(b). "Valuation Date" is defined as the last business day of each calendar quarter. *See Id.,* Plan Document at § 1.31. Paragraph 3 of the Trust Fund provides in pertinent part:

Each investment fund [i.e. the Fixed Income Investment Fund and the Diversified Investment Fund] shall be valued by the Trustees as of close of business at the end of each calendar quarter, or as may be agreed upon by the Employer and the Trustees, hereinafter referred to as "Valuation Date", and all charges and credits (between Valuation Dates) shall be considered as being made immediately after the next ensuing valuation.

*See* Exhibit D of Plaintiffs' Motion for Summary Judgment, Trust Agreement at p. 4.

Defendants argue, although not very convincingly, that, because both the Trust Agreement and the Plan Document governed the Plan, paragraph 3 of the Trust Agreement provided them with contractual authority to implement Interim Valuation Dates for use in determining the value of the benefits of a terminated plan participant. This argument is unreasonable and totally without merit.

Contrary to defendants' assertion, the Trust Agreement does not "control" the Plan. Rather the Trust Agreement states that it is intended merely to "implement the provisions and purposes set forth in the Plan" and that the Trust Agreement does not purport to govern the administration of the Plan, but only the "powers, rights, duties and obligations of the Trustees." *See* Exhibit D to Plaintiffs' Motion for Summary Judgment, Trust Agreement at §§ 1 and 15. In any event, defendants' argument is contrary to two well-settled principles of contract interpretation: (1) that specific provisions are given prece-dence over general ones, and (2) that a contract is to be considered as a whole and, if possible, all of its provisions should be given effect. *See, e.g., Capital Bus Co. v. Blue Bird Coach Lines, Inc.,* 478 F.2d 556, 560 (3d Cir.1973). To conclude that Interim Valuation Dates were permitted for the purpose of valuing the benefits of a terminated employee would render Section 9.01(b) of the Plan Document devoid of meaning. Moreover, the defendants did not invoke paragraph 3 of the Trust Agreement as authority for their implementation of the October 30, 1987 Interim Valuation Date until April of 1988—four months after they amended the Plan in December of 1987. *See* Exhibits Q and R to Plaintiffs' Motion for Summary Judgment. Hence, defendants invoked paragraph 3 of the Trust Agreement as merely an after-the-fact justification for their actions. *See Pratt v. Maurice L. Brown Co. Employee Savings Plan Trust,* 9 Employee Benefits Cas. (BNA) 2380, 2383 (D.Kan.1988).

In *Pratt v. Petroleum Production Management, Inc. Employee Savings Plan & Trust,* 920 F.2d 651 (10th Cir.1990), the defendants made an argument similar to the one proffered by the defendants in the present case. In rejecting defendants' argument that a general plan provision, which allows the plan trustee to determine the book and market values of the Trust Fund annually or "at such other times as are agreed upon with the Company," takes precedence over a specific plan provision, which provides a mandatory and specific date for valuation when an employee separates, the court stated:

Defendant's contention that § 11.8 somehow modifies §§ 7.5 and 2.24 [, which defines the term "Valuation Date",] to allow for interim valuation dates is not only incorrect, but also unreasonable. First, § 11.8 allows for valuation of the trust fund, not the particular member accounts. There is a difference.... Second, the definition of valuation date contained in § 2.24 nowhere references § 11.8 or discusses interim valuation dates; when § 2.24 was amended to provide for interim valuation it referenced not § 11.8, but rather a new provision

(§ 6.11) specifically allowing for interim valuation of accounts. Indeed, when the defendants denied plaintiff's claim for benefits, they did not reference § 11.8, but rather relied upon new § 6.11 and amended § 2.24 providing for interim valuations. Third, § 11.8, by its terms, does not provide authority to adjust participant accounts, which must occur prior to distribution.... While § 11.8 may provide for valuations needed for plan maintenance, it does not override the specific benefit provisions of the plan.

*Id.* at 660 (citations omitted).

Defendants have not adequately addressed or distinguished the essential identities of *Pratt* and the present case: (1) that the Trust Agreement permits interim valuation of the "Investment Fund," not of the accounts of the individual members, (2) that the definition of "Valuation Date" in the plan does not refer to interim valuation dates or to the provisions of the Trust Agreement relating to interim valuations, and (3) that the defendants did not rely on the provisions of the Trust Agreement in adopting the Amendment. Quite simply, I reject defendants' contention that the power to value the entire "trust fund" set forth in paragraph 3 of the Trust Agreement for purposes of periodic adjustment of account values provides authority for interim valuations of individual accounts for purposes of paying benefits—especially in light of the fact that there is a specific section of the Plan which specifically provides that an individual member's account will be valued as of the last date of the quarter on or immediately after the date of his termination of employment.

Alternatively, defendants argue that Section 13.01 of the Plan gave authority to the Board of Directors of Boyertown to amend the Plan in order to provide for Interim Valuation Dates. This argument is equally without merits.

Section 13.01 provides:

*The Board of Directors reserves the right at any time and from time to time, and retroactively if deemed necessary or appropriate, to amend in whole or in part any or all of the provisions of the Plan.* However, no amendment shall make it possible for any part of the funds of the Plan to be used for, or diverted to, purposes other than for the exclusive benefit of persons entitled to benefits under the Plan. *No amendment shall be made which has the effect of decreasing the balance of the Accounts of any Member* or of reducing the nonforfeitable percentage of the balance of the Accounts of a Member below the nonforfeitable percentage computed under the Plan as in effect on the date on which the amendment is adopted or, if later, the date on which the amendment becomes effective.

*See* Exhibit B of Plaintiffs' Motion for Summary Judgment, Plan Document at § 13.01 (emphasis added). Clearly, the result of the amendment implementing the Interim Valuation Date of October 30, 1987 had the effect of decreasing the balance of the accounts of the Plan participants with benefits invested in the Diversified Investment Fund whose employment at Boyertown was terminated during the second and third calendar quarters of 1987 (i.e.—between April 1, 1987 and September 30, 1987 inclusive).

It is beyond doubt that, based upon the clear and unambiguous language in Section 9.01(b), plaintiffs had a contractual right to their benefits valued as of September 30, 1987. Therefore, defendants' retroactive application of the October 30, 1987 Interim Valuation Date to plaintiffs' accrued benefits violated the clear and unambiguous terms of the Plan as it existed when the plaintiffs were terminated and, hence, was arbitrary and capricious.

**B.** *Violation of ERISA*

Even if Section 13.01 of the Plan had not prohibited an amendment which had the effect of decreasing the balance of a member's account, ERISA does not permit a retroactive amendment which has the effect of decreasing accrued benefits. Section 204(g)(1) of ERISA provides that the "accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment

described in section 1082(c)(8) or 1441 of this title."[6] 29 U.S.C. § 1054. With respect to an individual account plan, which is at issue in the present case, "accrued benefit" is defined as "the balance of the individual's account." 29 U.S.C. § 1002(23)(B).

Moreover, the case law supports plaintiffs' position that defendants were required to determine plaintiffs' benefits in accordance with the plan in effect at the time of their termination. *See Pratt v. Petroleum Production Management, Inc. Employee Savings Plan,* 920 F.2d 651, 661 (10th Cir.1990); *Brug v. Pension Plan,* 669 F.2d 570, 575–76 (9th Cir.1982); *Danti v. Lewis,* 312 F.2d 345, 349 (D.C.Cir.1962); *Morales v. Plaxall, Inc.,* 541 F.Supp. 1387, 1391 (E.D.N.Y.1982); *Denzer v. Purofied Down Products Corp. Profit–Sharing and Retirement Plan,* 474 F.Supp. 773, 776 (S.D.N.Y.1979).

The two cases relied upon by defendants for the proposition that retroactive application of an amendment permitting interim valuation dates does not violate ERISA are distinguishable from the present case. *See Holian v. Leavitt Tube Co.,* 1989 WL 44570, 1989 U.S.Dist. LEXIS 4584 (N.D.Ill. 1989); *Cator v. Herrgott & Wilson, Inc.,* 609 F.Supp. 12 (N.C.Cal.1984).

In *Holian v. Leavitt Tube Co.,* 1989 WL 44570, 1989 U.S.Dist. LEXIS 4584 (N.D.Ill. 1989), the committee that managed the administration and assets of the Plan added seven additional valuation dates on November 13, 1987, allegedly in response to the stock market crash on October 19, 1987. The interim valuation dates were applied retroactively, changing the valuation date for plaintiff's benefits from September 30, 1987 to October 31, 1987.

*Holian* is easily distinguishable from the present case because the Plan in *Holian* specifically permitted interim valuation dates in that "valuation date" was defined in section 2.52 of the Plan as follows:

Valuation Date means March 31, June 30, September 30, and December 31 of each year and such additional dates as the committee shall deem appropriate. Moreover, the court in *Holian* concluded that the retroactive application of the additional valuation dates did not violate section 204(g) of ERISA, 29 U.S.C. § 1054(g), because it was not an amendment to the Plan, but rather the application of a provision already incorporated into the Plan.

In *Cator v. Herrgott & Wilson, Inc.,* 609 F.Supp. 12 (D.C.Cal.1984), plaintiff's employer amended its pension plan to provide for "interim valuations" of the Plan's assets, in addition to the previously provided for valuation on an annual anniversary date. The changes to the Plan were made thirty days prior to plaintiff's retirement, and plaintiff's benefits were substantially reduced under the new interim valuation scheme. The court in *Cator* upheld the amendment as it applied to the plaintiff, but in doing so distinguished the facts of the case before it from cases in which the plan amendment was adopted after the employee's retirement or termination. *Id.* at 16.

In support of their motion for summary judgment, plaintiffs rely on *Pratt v. Maurice L. Brown Co. Employee Savings Plan,* 9 Employee Benefits Cas. (BNA) 2380 (D.Kan.1988). In *Pratt,* the Plan retroactively adopted an amendment altering the valuation date for the benefits of an employee who was terminated before the amendment was adopted. The court held that the amendment was arbitrary and capricious, violated ERISA and the defendants' fiduciary duties, and was invalid. In November of 1990, the Tenth Circuit affirmed the decision of the district court. *See Pratt v. Petroleum Production Management, Inc. Employee Savings Plan,* 920 F.2d 651 (10th Cir.1990).

The factual similarities between the present case and *Pratt* are such that the reasoning in *Pratt* is directly applicable to the present case. The following are the most obvious and general factual similarities:

---

6. Clearly, the language in section 13.01 prohibiting an amendment "which has the effect of decreasing the balance of the Accounts of any

Member" was added in order to comply with section 204(g)(1) of ERISA, 29 U.S.C. § 1054(g)(1).

(1) in both cases, the plan provided for valuations at fixed valuation dates;

(2) in both cases, the market value of the plan's assets declined between the valuation date for the plaintiff's benefits and the date payment was to be made;

(3) in both cases, the plan was retroactively amended to permit a valuation date after the decline in value and after the plaintiff's separation from employment in order to pay the plaintiff less money than would have been payable pursuant to the originally established valuation date;

(4) in both cases, there were provisions (in *Pratt*, in the Plan itself; in the present case, in the Trust Agreement) that permitted the trustees to value the plan's assets (but not the accounts of the individual participants) at dates other than the established valuation dates;

(5) in both cases, the plan amendment was applied retroactively to an employee who was terminated before the amendment was adopted; and

(6) in both cases, payment to the plaintiff resulted in a charge to the plan that reduced the value of the plan's assets, to the detriment of the remaining participants.

The Tenth Circuit in *Pratt* adopted the very position that plaintiffs advance in the present case—that an employee is entitled to his benefits in accordance with the terms of the Plan as of the date of his termination from employment:

A "pension plan is a unilateral contract which creates a vested right in the employees who accept the offer by continuing in employment the requisite number of years." When plaintiff was terminated, defendant was required to determine benefits in accordance with the plan then in effect. Subsequent unilateral adoption of an amendment which is then used to defeat or diminish the plaintiff's fully vested rights under the governing plan document is not only ineffective, but also arbitrary and capricious. Application of the retroactive amendment in these circumstances also is precluded by ERISA § 204(g); only under carefully limited circumstances, *see* 29 U.S.C. § 1082(c)(8), is an amendment permitted which would reduce an accrued benefit.

920 F.2d at 661 (citations omitted).

Defendants' attempts to distinguish *Pratt* are inadequate and cannot overcome the controlling similarities between *Pratt* and the present case. Defendants contend that *Pratt* is distinguishable from the present case because (1) *Pratt* did not involve the same "disastrous effect" on the remaining participants that they claim was present in the present case; (2) defendants in *Pratt* did not argue that ERISA does not guarantee any particular method of calculating benefits; and (3) defendants in *Pratt* also did not argue that payment to the plaintiff would have caused the plan to fail of its essential purpose. These arguments are of no avail.

First, the court in *Pratt* specifically considered the impact of the plaintiff's claim on the Plan, and the possibility that the Plan's assets would have been wiped out had more employees demanded payment when the plaintiff did. The Tenth Circuit rejected this argument as a basis for the reduction of the plaintiff's accrued benefits.

When a plan is silent or ambiguous and the result reached by the plan acting through its fiduciaries is not foreclosed by law, we will uphold the result. But here the plan document unambiguously addresses the valuation procedure, hence, the plan is contractually bound to honor that procedure as it existed when the plaintiff separated. While we are sensitive to the obligations of the plan's fiduciaries and the theoretically negative effect on other plan members, it would not be proper for the court in this instance to modify judicially the terms of the plan. That task falls to the plan's administrator and trustees, and we note that the plan now has been amended to provide for interim valuation.

*Id.* at 662 (citations omitted).

Second, defendants rely on *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981), in support of their argument that ERISA

does not guarantee any particular method of calculating benefits and that a change in the method of calculation is not prohibited unless it totally eliminates benefits. Defendants' reliance on *Alessi* is misplaced. The Supreme Court in *Alessi* held only that the exclusion of unemployment compensation payments from the calculation of benefits under a pension plan is specifically permitted under ERISA and does not constitute a prohibited "forfeiture" of a "vested" benefit. *Alessi* dealt with *vesting* and *forfeiture* issues and did not even purport to deal with the issue in the present case—the reduction of *accrued* benefits.

■ Finally, although defendants argue that the reduction of the Plan's assets resulting from paying Kay and the plaintiff class would have "frustrated the essential purpose" of the Plan,[7] defendants have admitted that there were sufficient funds in the Plan after Black Monday to pay plaintiffs their benefits and still have assets in the Plan to pay benefits to the remaining participants as they retired. Defendants' argument is nothing more than the fact that the remaining assets in the Investment Fund would have been reduced by a greater amount if they had not amended the Plan retroactively to reallocate a portion of the loss to the plaintiff class. This is a far cry from defendants' allegations of "failure of the Plan's essential purpose" and "impossibility of payment." A mere diminution in the assets available for distribution to remaining participants does not cause the Plan to "fail of its essential purpose." As the court in *Pratt* noted, under ERISA, an amendment may be retroactively applied to reduce accrued benefits only if the Secretary of Labor finds it appropriate because of "financial hardship" under 29 U.S.C. §§ 1082(c)(8) and 1083.

*Pratt,* 920 F.2d at 661. Defendants did not attempt to show, nor could they had they tried, that the Plan qualified for the financial hardship exception.[8] The fact that the payment to the plaintiff class would have reduced the remaining Plan assets by an amount greater than that caused by the drop in the stock market is simply an insufficient ground as a matter of law for deviating from the clear and unambiguous terms of the Plan and mandates of ERISA.

In fact, because defendants failed to avail themselves of the financial hardship exception, this court need not even consider the seriousness of the Plan's financial condition or the hardship that would have been borne by the non-retired participants if the Plan would have valued the benefits as of September 30, 1987. In neglecting to avail themselves of 29 U.S.C. § 1082(c)(8), "defendants cannot now complain of their financial straits." *Hoover v. Cumberland, Maryland Area Teamsters Pension Fund,* 756 F.2d 977, 984 (3d Cir.1985). In *Hoover,* the court stated:

> We need not resolve the questions of the seriousness of the Fund's financial condition or the appropriateness of the trustees' action *vis-a-vis* other possible options. Section [1054(g)] flatly prohibits reductions of accrued benefits. The single exception is provided in section [1082(c)(8)], under which the Secretary of the Treasury may grant a request to amend benefit amounts within specified limits on a finding that the amendment is necessary to preserve the fund and a simple waiver of ERISA's minimum funding standards would not solve the problem. Rather than comply with this procedure, the trustees unilaterally effected a retroactive elimination of a bene-

---

7. Defendants did not make this argument in their Memorandum of Law in Support of Their Motion for Summary Judgment. Instead, defendants make this argument for the first time in their Memorandum discussing the Tenth Circuit Court of Appeals' decision in *Pratt v. Petroleum Production Management, Inc. Employee Savings Plan,* 920 F.2d 651 (10th Cir.1990).

8. A finding of financial hardship requires that the Secretary of Labor conclude that:

(1) the employer is operating at an economic loss;
(2) there is substantial unemployment or underemployment in the trade or business and in the industry concerned;
(3) the sales and profits of the industry are depressed or declining; and
(4) it is reasonable to expect that the plan will be continued only if the waiver [under 29 U.S.C. § 1083(a)] is granted.
29 U.S.C. § 1083(b).

fit increase adopted six years earlier. In neglecting to avail themselves of section [1082(c)(8) ], defendants cannot now complain of their financial straits. ERISA does not authorize this court's exercise of discretion in the matter.

*Id.* at 984.

Accordingly, this court holds that defendants were required to determine the value of plaintiffs' accrued benefits in accordance with the terms of the Plan that were in effect at the time that plaintiffs were terminated and that defendants' retroactive application of the amendment permitting Interim Valuation Dates was arbitrary and capricious, an abuse of discretion, and in violation of the clear mandate of ERISA set forth in 29 U.S.C. § 1054(g).

### C. *Breach of Fiduciary Duties*

■ The standard for review of the fiduciaries' performance of their duties is set forth in 29 U.S.C. § 1104, and this court need not look beyond the terms of the statute in reviewing the manner in which the fiduciaries discharged their duties. Because I have concluded, under the arbitrary and capricious standard of review, that the retroactive amendment of the Plan to provide for an Interim Valuation Date of October 30, 1987 violated the clear and unambiguous language of the Plan, I must also conclude that the fiduciary defendants breached their fiduciary duty to act "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). *See, e.g., Hlinka v. Bethlehem Steel Corp.*, 863 F.2d 279, 286 (3d Cir.1988) (an award inconsistent with the plan's valid provisions would be a breach of fiduciary duty); *Ironworkers Local No. 272 v. Bowen*, 695 F.2d 531, 535 (11th Cir. 1983) (failure to act in accordance with the documents governing the plan is automatically a breach of fiduciary duty); *Pratt*, 9 Employee Benefits Cas. (BNA) at 2384 (post-termination change in valuation date was breach of fiduciary duty). The more difficult question in the present case is determining which of the non-Plan defendants acted in a fiduciary capacity with respect to the adoption and implementation of the October 30, 1987 Interim Valuation Date.

Under ERISA, a person is a "fiduciary" with respect to a plan to the extent:

(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). In addition, ERISA provides that certain persons qualify as plan fiduciaries by being "named fiduciaries" under a plan. 29 U.S.C. § 1102(a).

■ Each non-Plan defendant exercised, or took responsibility for, discretionary authority over the decision to adopt and implement the October 30, 1987 Interim Valuation Date, which was a decision effecting the disposition of the Plan's assets:

1. *The Thrift Committee.* The Thrift Committee of the Plan consisted of defendants Gould, Beck and Plowman, all SCI executives. These defendants turned down Kay's administrative request for payment of his full benefits. Thus, they affirmed the Amendment and ratified the violation of Kay's rights. *See* Exhibits O and R to Plaintiffs' Motion for Summary Judgment. The Thrift Committee also qualifies as a "named Fiduciary" under ERISA.

2. *SCI.* As the parent corporation of AFS, SCI had the final word on the decision to amend the Plan Document. SCI, by letter, directed David Gravitz of Buck Consultants to value Kay's account according to the Interim Valuation Date, and took full responsibility for the decision. "The purpose of this letter is to inform you of *Service Corporation International's* decision to declare an interim valuation date of October 30, 1987 through an amendment to the plan." *See* Exhibit X to Plaintiffs' Motion for Summary Judgment (emphasis added). Defendant Joseph Turner specifically informed Doney that SCI would decide how to handle the effect of Black Monday on the Plan. *See* Exhibit C to Plaintiffs' Motion for Summary Judgment,

Doney Deposition at pp. 37–38. In addition, individual defendants Lacy, Turner, Beck, Gould, Payne, and Dees were all officers of SCI, acting on its behalf.

3. *AFS/Boyertown.* The Plan Document reserves the power to amend the Plan to the Directors of the *employer.* See Exhibit B to Plaintiffs' Motion for Summary Judgment, Plan Document at § 13.01. The Board of Directors of AFS (which first acquired Boyertown on May 15, 1987, then changed its name to Boyertown on April 1, 1988) adopted the Amendment that retroactively changed the Plan Document to permit the October 30, 1987 Interim Valuation Date.

4. *Barry Doney.* Doney was the Plan Administrator. He admits exercising his discretionary judgment and authority in favor of adopting the Amendment, and personally instructed Buck not to proceed with the September 30, 1987 valuation. *See* Exhibit C to Plaintiffs' Motion for Summary Judgment, Doney Deposition at pp. 45–48. In addition, Doney was responsible for managing the Plan and took no steps whatsoever to prevent the "leveraging" effect, despite the record number of employees being cashed out and warnings from his colleague, Fred Ihrig. This failure, whether viewed as a negligent failure or a conscious gamble, is at the root of the problem that led to the Amendment. Doney also qualifies as a named fiduciary under ERISA.

5. *Sharon Lacy.* Lacy was manager of the pension department of SCI. She was the principal architect of the idea to use an Interim Valuation Date. *See* Exhibit C to Plaintiffs' Motion for Summary Judgment, Lacy Deposition at pp. 74–91, 96–102; *see also* Exhibit J to Plaintiffs' Motion for Summary Judgment.

6. *Joseph Turner.* Turner was a director of AFS. As such, he signed the Amendment. *See* Exhibit O to Plaintiffs' Motion for Summary Judgment. Sharon Lacy also reported directly to Turner. *See* Exhibit C to Plaintiffs' Motion for Summary Judgment, Lacy Deposition at p. 20. Turner received advice directly from Buck advising against the Interim Valuation, but approved the Amendment anyway. *See* Exhibit M to Plaintiffs' Motion for Summary Judgment.

7. *David Beck, Donald Gould, Keith Plowman.* Beck, Gould, and Plowman were named members of the Thrift Committee and Plan Trustees on March 3, 1988. In their role as trustees, they retroactively attempted to affirm the Amendment by entering into the April 1988 agreement with AFS to permit the October 30, 1987 interim valuation. As members of the Thrift Committee, they reviewed and arbitrarily rejected Kay's claim for his benefits.

8. *E. Keith Payne and Ben Dees.* Payne and Dees were members of the Board of Directors of AFS. As such, they adopted the Amendment and entered into the retroactive April, 1988, agreement with the Trustees.

I conclude that all of the non-Plan defendants qualify as fiduciaries under ERISA with respect to the adoption and implementation of the Interim Valuation Date of October 30, 1987. Hence, the non-Plan fiduciary defendants are personally liable [9] (jointly and severally) for the judgment that shall be entered in favor of plaintiffs for failing to discharge their duties "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104. In addition, under 29 U.S.C. § 1109,[10] the fiduciary defendants are per-

---

9. 29 U.S.C. § 1132(d)(2) states that "[a]ny money judgment under this subchapter against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this subchapter." Since defendants are personally liable under sections 1102, 1104, and 1109, section 1132 does not apply.

10. Section 1109 provides in pertinent part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and

sonally liable to the Plan for losses resulting from breaches of their duties. *See, e.g., Davidson v. Cook,* 567 F.Supp. 225, 240 (E.D.Va.1983). Therefore, the Plan can recoup from the non-Plan fiduciary defendants any losses that it sustains as a result of this litigation.

### D. *Prejudgment Interest*

■ In addition to the difference between the value of their benefits as of September 30, 1987 and the value of their benefits as of October 30, 1987, plaintiffs also request an award of prejudgment interest. Defendants do not object to this request.

Although ERISA does not specifically provide for prejudgment interest, courts have awarded it in cases in which a plan participant has been wrongfully denied his pension benefits. *See, e.g., Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208 (8th Cir.1981); *Kann v. Keystone Resources, Inc.,* 575 F.Supp. 1084 (W.D.Pa.1983). It is within the court's discretion to award prejudgment interest. *See American Timber & Trading Co. v. First National Bank of Oregon,* 690 F.2d 781, 784 (9th Cir.1982); *Kann,* 575 F.Supp. at 1095.

I conclude that, in the present case, it is appropriate to award prejudgment interest to the plaintiffs in order to make them whole. I further conclude, based upon the well-reasoned and persuasive opinion by the Eighth Circuit Court of Appeals in *Dependahl,*[11] that the appropriate rate for prejudgment interest in ERISA cases is the rate for post-judgment interest set forth in 28 U.S.C. § 1961:

> shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. 29 U.S.C. § 1109(a).

**11.** In *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208 (8th Cir.), cert. denied, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981), the leading case on the issue of prejudgment interest awards in ERISA cases, the court held that prejudgment interest is applicable in ERISA cases because it is "necessary in order that plan participants obtain 'appropriate equitable relief.'" *Id.* at 1219 (quoting 29 U.S.C. § 1132(a)(3)(B)). Reasoning that the question concerning the appropriate rate of interest to

Interest shall be allowed on any money judgment in a civil case recovered in a district court.... Such interest shall be calculated from the date of entry of the judgment, at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of judgment.

28 U.S.C. § 1961(a), as amended April 2, 1982. When the rate set forth in 28 U.S.C. § 1961(a) is applied to determine an award of prejudgment interest, it is calculated based upon the rate obtained immediately prior to the date that plaintiff first demanded his benefits. *Kann,* 575 F.Supp. at 1096. Accordingly, plaintiffs shall be awarded prejudgment interest at the rate for fifty-two week treasury bills auctioned at the auction immediately preceding the request of William Kay's attorney made on February 2, 1988 for Kay's benefits valued as of September 30, 1987. *See* Exhibit P to Plaintiffs' Motion for Summary Judgment.

### E. *Attorney Fees*

■ Plaintiffs also request this court to award attorney fees. Pursuant to 29 U.S.C. § 1132(g),[12] I have discretion to award the plaintiffs reasonable attorney fees and costs.

As a general rule, ERISA plaintiffs are entitled to attorney fees and costs if they succeed on any significant issue which achieves any of the relief sought. *See Smith v. CMTA–IAM Pension Trust,* 746 F.2d 587, 589 (9th Cir.1984). The factors

apply in a case involving a federal statute is a federal question, the court looked to the most analogous federal statute—28 U.S.C. § 1961, the federal statute providing for post-judgment interest. The court concluded that, in order to be consistent, the rate used for post-judgment interest in federal cases should also be applied for prejudgment interest in federal cases.

**12.** Section 1132(g) provides in relevant part:

> In any action under this subchapter ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

that should be considered in determining whether to make an award of attorney fees under ERISA include:

(1) the offending parties' culpability or bad faith;

(2) the ability of the offending parties to satisfy an award of attorneys; fees;

(3) the deterrent effect of an award of attorneys' fees against the offending parties;

(4) the benefit conferred on members of the pension plan as a whole; and

(5) the relative merits of the parties' position.

*Ursic v. Bethlehem Mines,* 719 F.2d 670, 673 (3d Cir.1983).

The parties have not provided me with all of the information necessary to determine whether it is appropriate in the present case to award fees and costs pursuant to 29 U.S.C. § 1132(g). Consequently, I shall establish a schedule for full briefing of the attorney fees issue.

### III.

In their third-party complaint, defendants contend that any judgment assessed against them in this action should be recouped from the fifty-five third-party defendants, who were all Plan participants in the Diversified Investment Fund after September 30, 1987. Of those fifty-five individuals, approximately forty-one have terminated their employment and received benefits under the Plan based upon the October 30, 1987 Interim Valuation Date. Approximately fourteen of the third-party defendants are still participants in the Plan, but their account balances in the Plan were adjusted and calculated in accordance with the October 30, 1987 Interim Valuation Date.

Plaintiffs have not alleged any claims against, or sought any recovery from, any of the third-party defendants. The sole involvement of the third-party defendants is defendants' claim for restitution. Defendants' theory of liability against both groups of third-party defendants (i.e. the 41 terminated/former participants and the remaining participants) is essentially the same—if this court determines that the defendants made a mistake in adopting the October 30, 1987 Interim Valuation Date and that the defendants have to pay plaintiffs some or all of the damages sought, then (1) some of the monies paid to the forty-one employees terminated post-September 30, 1987 should be repaid to the Plan; and (2) the accounts of the fourteen remaining Plan participants should be revalued and reduced accordingly.

The third-party defendants filed a motion for summary judgment against the defendants. Third-party defendants allege that the defendants should be legally precluded from attempting to recover benefits previously paid to terminated/former participants and from readjusting the account balances of individuals who are still participants because, among other reasons, the decision of the defendants to amend the Plan was a mistake of law which they made while exercising the discretion granted to them by the Plan. In support of this argument, the third-party defendants rely on section 45 of the Restatement of Restitution, entitled "Satisfaction of Non–Existent Obligation. When Restitution Not Granted." Section 45 provides as follows:

> Except as otherwise stated in §§ 46–55, a person who, induced thereto solely by a mistake of law, has conferred a benefit upon another to satisfy in whole or in part an honest claim of the other to the performance given, is not entitled to restitution.

Restatement (Second) of Restitution § 45.

Defendants, on the other hand, contend that this court can look only to principles of trust law when developing federal common law with respect to rights and obligations under ERISA-regulated plans. Therefore, defendants maintain that the distinction made in the Restatement of Restitution between mistakes of law and mistakes of fact has no application to the present case because the Restatement (Second) of Trusts does not recognize that distinction. In fact, defendants maintain that section 254 of the Restatement (Second) of Trusts mandates the restitution they seek from

the third-party defendants. Section 254, entitled "Overpayment to One Beneficiary," provides:

> If the trustee has made a payment out of trust property to one of several beneficiaries to which the beneficiary was not entitled, such beneficiary is personally liable for the amount of such overpayment, and his beneficial interest is subject to a charge for the repayment thereof, unless he has so changed his position that it is inequitable to compel him to make repayment.

Restatement (Second) of Trusts § 254.

■ In determining the appropriate standard of judicial review of benefit determinations by fiduciaries or plan administrators under ERISA, the United States Supreme Court in *Firestone Fire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), looked for guidance to principles of trust law. However, at no time did the Supreme Court in *Bruch* state that, in developing a "federal common law of rights and obligations under ERISA-regulated plans," courts could look only to the law of trusts for guidance.

In resolving issues involving ERISA-regulated plans, courts have also looked to principles of equity. In determining whether the one-year period set forth in 29 U.S.C. § 1103(c)(1)–(2)(A) barred the application of the employer for a refund of contributions mistakenly paid into a pension fund on behalf of one of its employees, the Third Circuit Court of Appeals in *Reuther v. Trustees of the Trucking Employees of Passaic and Bergan County Welfare Fund,* 575 F.2d 1074 (3d Cir.1978), applied principles of equity in light of the emphasis that Congress had placed on "the equitable character" of the regulated pension plans. *Id.* at 1078; *see* 29 U.S.C. § 1001(c).

In *Naugle v. O'Connell,* 833 F.2d 1391 (10th Cir.1987), an employee, attempting to avoid having to refund the trustees of his pension plan for overpayments which they had mistakenly paid into his account, ar-gued that the monies had been paid as a result of a mistake of law and that, pursuant to section 45 of the Restatement of Restitution, the trustees of the plan were not entitled to restitution. In holding for the trustees, the court concluded that the mistake made by the trustees was one of fact, rather than one of law. However, the court did not reject the plaintiff/employee's argument that restitution was not appropriate when overpayments were made as a result of a mistake of law and, in fact, implied that, if the overpayments had resulted from a mistake of law, the employee would have prevailed:

> Because we have determined that the trustees' payment of pension benefits to Naugle was based on their mistake of fact as to his employment status, we determine that they are entitled to restitution of the $6,902.89 which they have already paid to Naugle plus interest on that amount.

*Id.* at 1398.

This court can find no support for defendants' contention that courts are bound by the law of trusts in developing a body of federal common law with respect to rights and obligations under ERISA-regulated plans. Hence, I conclude that (1) I may look for guidance to both the principles of trust law and equity and that (2) I am not bound by either.

■ In the present case, defendants knew prior to amending the Plan to provide for Interim Valuation Dates that adopting the amendment could possibly lead to litigation because the amendment potentially violated both the Plan and ERISA. *See* Exhibit C to Memorandum of Law Submitted on Behalf of Third–Party Defendants in Support of Their Motion for Summary Judgment (i.e. eleven-page memorandum dated December 8, 1987 prepared for the defendants by Carol H. Jewett, Esquire, which summarized the problems facing the Plan as a result of Black Monday and outlined various alternatives and the pros and cons associated with each). None-

theless, defendants chose to adopt the amendment retroactively even though they had been advised by their attorney of the potential liability associated with the retroactive adoption of an Interim Valuation Date and of the possibility of seeking instruction and guidance from an appropriate federal district court by initiating a declaratory judgment action pursuant to section 502 of ERISA.[13]

In other words, defendants knowingly assumed the risk of violating the Plan and ERISA, as well as breaching their fiduciary duties owed to the Plan participants. Consequently, I conclude that defendants cannot seek restitution from the third-party defendants for liability for which defendants assumed the risk and which resulted from defendants' failure to discharge their fiduciary duties in accordance with the documents and instruments governing the Plan. *See* 29 U.S.C. § 1104(a)(1)(D).

Because the fiduciary defendants breached their duty to the Plan participants to act in accordance with the documents and instruments governing the Plan, the fiduciary defendants are directly liable to plaintiffs under 29 U.S.C. § 1104. *See* 29 U.S.C. § 1132(d)(2); *Ironworkers Local No. 272 v. Bowen,* 695 F.2d 531 (11th Cir.1983); *Davidson v. Cook,* 567 F.Supp. 225 (E.D.Va.1983), *aff'd,* 734 F.2d 10 (4th Cir. 1984). It would not only be inequitable, but also contrary to the purpose of imposing direct liability on fiduciaries for damages incurred as a result of breaches of their fiduciary duty, to permit the fiduciary defendants to recoup the judgment assessed against them for the damages incurred by the plaintiffs from those Plan participants who were fortunate not to have been injured as a result of the adop-

tion and implementation of the October 30, 1987 Interim Valuation Date.[14]

## IV.

For the reasons set forth above, I conclude that plaintiffs are entitled to their accrued benefits valued as of September 30, 1987 and that defendants are not entitled to restitution from the third-party defendants.

An appropriate order follows.

## ORDER

Upon consideration of plaintiffs' motion for summary judgment, defendants' motion for summary judgment, the third-party defendants' motion for summary judgment, the parties' supporting memoranda and exhibits, and for the reasons stated in the accompanying memorandum,

IT .IS ORDERED THAT

1. Plaintiffs' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

a. Plaintiffs' motion for summary judgment is GRANTED with respect to the liability issues and plaintiffs' request for prejudgment interest. Plaintiffs are entitled to receive the value of their pension benefits as of September 30, 1987. Therefore, judgment shall be entered in favor of plaintiffs and against defendants in an amount equal to the difference between the value of plaintiffs' benefits as of September 30, 1987 and the value of their benefits as of October 30, 1987, plus prejudgment interest. Within fourteen (14) days of the date this order is entered by the Clerk, plaintiffs shall

---

13. In fact, comment b to section 201 of the Restatement (Second) of Trusts provides that "[i]f he [the trustee] is in doubt as to the interpretation of [the trust] instrument, he can protect himself by obtaining instructions from the court." Seeking guidance from the appropriate federal district court would have been the obvious solution to the dilemma facing the defendants as a result of the precipitous drop in the stock market on Black Monday. Instead, how-

ever, the defendants choose to gamble, thereby assuming the risk associated therewith.

14. As noted earlier, pursuant to 29 U.S.C. § 1109, the Plan defendant can recoup from the fiduciary defendants any losses that it sustains as a result of a breach of any responsibility, obligation, or duty imposed by ERISA—which includes losses incurred as a result of this litigation.

submit a proposed form of order entering judgment in favor of plaintiffs and against defendants and specifically setting forth the amount of the award plus interest to be allocated to each member of the plaintiff class.

b. Plaintiffs' motion for summary judgment is DENIED WITHOUT PREJUDICE with respect to plaintiffs' request for reasonable attorney fees and costs pursuant to 29 U.S.C. § 1132(g) because plaintiffs have not presented this court with sufficient information in order to determine whether their request should be granted. Within thirty (30) days of the date this order is entered by the Clerk, plaintiffs shall file a separate motion for attorney fees and costs, along with a supporting memorandum and affidavits. In their memorandum, plaintiffs shall address fully and completely all of the issues associated with their request for attorney fees and costs, including, among other things, (1) a discussion of the factors set forth in *Ursic v. Bethlehem Mines*, 719 F.2d 670, 673 (3d Cir. 1983), (2) a request for an award of attorney fees in a specific amount, (3) a request for an award of costs in a specific amount, and (4) a discussion concerning the reasonableness of those requested amounts. Defendants shall respond within three (3) weeks of the date of service.

2. Defendants' motion for summary judgment is DENIED.

3. Third-party defendants' motion for summary judgment is GRANTED.